**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Orlando C. ALEXANDER, Defendant-Appellant.**

**No. 17021.**

United States Court of Appeals Seventh Circuit.

Aug. 5, 1969.

Rehearing En Banc Denied Sept. 10, 1969.

Arthur H. Grant, Earl J. Barnes, Barnes & Grant, Chicago, Ill., for Orlando C. Alexander, for appellant.

Thomas A. Foran, U. S. Atty., William T. Huyck, Chicago, Ill., for plaintiff-appellee. John Peter Lulinski, Michael B. Nash, Asst. U. S. Attys., of counsel.

Before KILEY and CUMMINGS, Circuit Judges, and ESCHBACH,[1] District Judge.

CUMMINGS, Circuit Judge.

Defendant Orlando C. Alexander, a postal service employee, was indicted for embezzling 973 pieces of mail on July 25, 1967, in Chicago, in violation of Section 1709 of the Criminal Code (18 U.S.C. § 1709). The jury found him guilty and he received an 18-month sentence.

According to the evidence adduced on defendant's pre-trial motion to suppress the 973 pieces of mail, Albert Agurkis, a Railway Express Agency security officer, saw defendant unlock a 1967 Oldsmobile parked near the main Chicago post office at 9:00 p.m. on July 25. He was wearing a light-colored straw hat, work apron, light shirt and dark trousers and had a goatee. Defendant entered the rear of the car, looked from the right to the left and so moved his shoulders and upper portion of his body that he appeared to be taking something out from either his shirt or under his work apron. After 15 minutes, defendant emerged, locked the car and walked toward the post office. With the aid of his flashlight, Agurkis looked inside the Oldsmobile and saw a mound on the floor in front of the rear seat, covered by a shirt, with two letters sticking out. At least one bore a Clinton, Iowa, postmark.[2] Agurkis reported the foregoing to his superior, M. J. Iorio.

At 10:00 p. m., Agurkis was joined in the vicinity of the car by Iorio and postal inspector McCabe. After conversing with Iorio and Agurkis, McCabe telephoned inspector Jacobs at his home about 10:15 p. m. Jacobs thereupon left his home, joining the others about 10:45 p. m.

At 11:30 p. m., Agurkis saw the defendant return to the Oldsmobile, accompanied by a shorter man. Defendant was attired in the same clothing as before, except that he was not wearing his work apron. At that time, defendant's companion, who was later identified as Clarence Puckett, unlocked the driver's door and defendant entered the back and sat on the rear seat while Puckett sat behind the wheel.

Accompanied by Agurkis, Jacobs arrested defendant at 11:30 p. m. At that time, he saw a shirt on the rear seat, driver's side, "with numerous pieces of mail on top of that shirt." Agurkis simultaneously observed the mail on the white shirt on the back seat of the car.[3]

Subsequently, the mail on the rear seat of the Oldsmobile was found to consist of 973 letters in coin refund envelopes posted by Nielsen Clearinghouse in Clinton, Iowa, to addressees in suburban Chicago. The postal work hours for the third shift on July 25 were from 3:00 p. m. to 11:30 p. m.

Defendant testified at the trial that he and a co-worker, William Jenkins, were in a tavern and at the Baltimore & Ohio Railroad station at the time of the first episode. He said that he accom-

1. Judge Eschbach is sitting by designation from the United States District Court for the Northern District of Indiana.

2. At the trial Agurkis said that both envelopes were metered mail from Clinton, Iowa, to Park Ridge, Illinois.

3. In trial testimony, Agurkis stated that a brown paper bag containing some mail matter was also on top of the white shirt. Postal inspectors Boksa and Jacobs confirmed this. The trial testimony showed that at least some of this mail would have been handled by defendant in the course of his duties at the post office.

panied Puckett to his car at 11:30 p. m. in order to go to another tavern, and that he used the back seat of the car because Puckett was going to pick up riders.

*Postal Inspector Jacobs' Power to Arrest*

██ Defendant first argues that postal inspectors have no power to arrest, so that the mail in question was improperly seized from the Oldsmobile. This argument was not made below and strictly need not be considered now. United States v. Jones, 204 F.2d 745, 758 (7th Cir. 1953), certiorari denied, 346 U.S. 854, 74 S.Ct. 67, 98 L.Ed. 368. If the point had been timely raised, it would be without merit in view of 39 U.S.C. § 3523 (a) (2) (K) which authorizes postal inspectors to apprehend and effect arrests of postal offenders. Neggo v. United States, 390 F.2d 609 (9th Cir. 1968); Kelley v. Dunne, 344 F.2d 129 (1st Cir. 1965).[4]

*Probable Cause for Arrest*

Defendant next contends that even if postal inspector Jacobs had the power to arrest without a warrant, the motion to suppress should be granted on the ground that there was no probable cause for the arrest as required by the Fourth Amendment. The district court concluded that enough evidence had been presented at the pre-trial suppression hearing to satisfy the probable cause requirement. We agree.

██ As delineated in Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L. Ed.2d 142, the constitutional test for determining probable cause for making an arrest is whether the facts and circumstances within the officers' knowledge "and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense. * * * 'The rule of probable cause is a practical, non-technical conception * * *.' " The evi-

dence adduced at the hearing on the motion to suppress satisfies the *Beck* test.

First, at 9:00 p. m. on the evening in question, REA security officer Agurkis observed defendant in the vicinity of the post office wearing working clothes. At this hour postal workers from the 3:00 p. m. to 11:30 p. m. shift would be the likeliest persons to be in the area. Defendant entered the rear seat of the locked automobile, looked from side to side, and then appeared to be removing something from under his shirt or work apron. After sitting alone in the rear seat for some 15 minutes, he returned in the direction of the post office. Agurkis inspected the locked interior with a flashlight and saw a mound on the floor covered by a shirt and two letters sticking out. The letters were metered mail, originating in Clinton, Iowa, and destined for Park Ridge, Illinois. Because of the suspicious circumstances, he immediately notified his superior, M. J. Iorio.

When postal inspector McCabe joined Agurkis and Iorio that evening at 10:00 p. m., they had a conversation. McCabe obtained sufficient information to prompt him to telephone inspector Jacobs at his home at 10:00 p. m., resulting in Jacobs' joining the others at 10:45 p. m.

When Jacobs arrested defendant in the rear seat of the car about 11:30 p. m., Jacobs was accompanied by Agurkis. Both of them then saw that there was a white shirt now on the rear seat of the Oldsmobile and covered by a quantity of mail. Defendant was sitting next to this material instead of in the front seat next to Puckett.

On the basis of the defendant's actions during the first visit to the car at 9:00 p. m. and the fact that the two visible letters of what appeared to be a large mound of concealed mail had evidently been run through a mailing machine in Clinton, Iowa, and come to the Chicago post office on their way to Park Ridge,

---

4. Alexander v. United States, 390 F.2d 101 (5th Cir. 1968), holds to the contrary but was repudiated by the enact-

ment of 18 U.S.C. § 3061, effective on October 12, 1968.

**1356**

Illinois, Agurkis had reasonable grounds to believe that the mail was stolen or embezzled. It is also apparent that Agurkis communicated the incident to Iorio who then contacted the postal authorities. Officer McCabe conferred with Agurkis and Iorio before determining to call in Jacobs. From this and the fact that Jacobs was on the scene in the company of Agurkis for some 45 minutes prior to the arrest, the trial court was warranted in inferring that Jacobs had obtained the description of defendant along with the rest of the information before making the arrest. See People v. Glenn, 35 Ill.2d 483, 486, 221 N.E.2d 241 (1966). Agurkis' testimony that he did not give Iorio a description of defendant *"at that time,"* meaning when he first called Iorio at 9:15 p. m., also supports such an inference. The fact that some of the mail had apparently been moved from the floor to the back seat after defendant had entered the back seat at 11:30 further supports the arresting officers in their reasonable belief that defendant was personally involved in handling the embezzled mail. United States v. Sorce, 325 F.2d 84, 86 (7th Cir. 1963), certiorari denied, 376 U.S. 931, 84 S.Ct. 701, 11 L.Ed.2d 651; United States v. Riso, 405 F.2d 134 (7th Cir. 1968), certiorari denied, 394 U.S. 959, 89 S.Ct. 1306, 22 L.Ed.2d 560.

Defendant places special reliance on United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210, for the proposition that one's mere presence at the scene of an unlawful transaction is not probable cause to believe that he participated in a crime. In that case a reliable informant told police that he was going to make a purchase of counterfeit ration stamps from Buttita. When the arresting officers arrived on the scene, the informer had ration stamps in his hand and identified Buttita as the source of the stamps. Di Re was sitting in the front seat of Buttita's car, next to Buttita. Since the officers had no previous information about Di Re, the Court held that there was no probable cause to arrest him. The Court suggested that the arrest of Buttita was valid because of the prior tip by the informer and his confirmatory identification under circumstances which bore out his earlier information. We are of the opinion that defendant in the present case is in the position of Buttita rather than Di Re, with Agurkis satisfying the role of the informer in *Di Re.*

Defendant also relies on Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134, but nothing there indicated that the whisky cartons which defendants were transporting were in fact part of a stolen shipment, whereas here, as in United States v. Sorce, *supra,* at the time of the arrest the agents could reasonably believe that the large quantity of mail originating in Iowa and concealed in the back of a private automobile at night near the post office in Chicago had been removed from the mails.

*Evidentiary Rulings*

Defendant also complains of certain evidentiary rulings by the trial judge. In describing defendant's actions in the rear seat of the Oldsmobile at the first encounter on July 25, Agurkis testified at the trial:

"He was sitting with his back towards me and he was looking from right to left. In the upper portion of his body it appeared as if he was removing something—"

Upon defense counsel's objection, the last part of the statement was stricken. Shortly thereafter, Agurkis attempted to describe defendant's movement in the car at that time as follows:

"The movement of the upper portion of his body was taking something from under his apron or his shirt."

This answer was also stricken upon objection by defendant's counsel, and Agurkis was only permitted to testify in this regard as follows:

"The upper portion of his body was moving from right to left with his arms."

The stricken matter did not refer to stolen mail or other matters beyond the immediate observations of the witness.

The references to what defendant appeared to be doing were simply an attempt to summarize the witness's sensory impressions as to defendant's head, arm and body movements. There is no general rule excluding such conclusions based on personal observation and common experience as to the physical condition or actions of another. See Cox v. United States, 103 F.2d 133 (7th Cir. 1939). Without deciding whether the trial court's sustaining of defendant's objections was required, in view of the fact that the testimony objected to was stricken, we find no prejudicial error on this point.

■ Defendant next insists that Government Exhibit 11, showing all of the mail found on July 25 on the back seat of the Oldsmobile, either on top of the white shirt or in the brown paper bag, was improperly admitted. This photograph was introduced because the Government retained only 10 of the 973 pieces of stolen mail for use at the trial, while dispatching the remainder to the addressees through the postal system. The objection to the receipt in evidence of Government Exhibit 11 was predicated on the best evidence rule. However, the defendant cited no authority to the trial judge nor to us to show that the best evidence rule must be applied to photographs of demonstrative evidence. Nor would the fact that the subject of the photograph happened to be written documents serve to bring the policies behind the best evidence rule into play. The photograph was introduced to show the quantity of mail seized at the time of the arrest and not for the purpose of demonstrating anything about the contents of the particular letters which would be better shown by the originals than by a photographic copy. We decline to adopt a rule which would require in all cases that the total amount of contraband be introduced into evidence despite the possible inconvenience to the rightful owners. No objection is made that the 10 pieces of mail introduced did not fairly represent the bulk of the mail shown in the photograph. In our view, the receipt of the photograph was well within the discretion of the trial court. United States v. Birnbaum, 337 F.2d 490, 496 (2d Cir. 1964).

■ Defendant's brief claims that the substitution of Exhibit 11 for the mail itself was prejudicial because if the jury saw the physical bulk of the 973 pieces of mail, it would have concluded that defendant did not bring the mail to the Oldsmobile under his apron or shirt. However, the jury was not required to determine that all 973 pieces of mail were brought to the car at the same time and, at any rate, the photograph adequately shows the great volume of mail involved, enabling the defendant to make the same point as if the entire 973 pieces of mail were in evidence.

■ The defendant also asserts that the district judge committed reversible error by permitting defendant's alibi witness Jenkins to state that it was possible for one man to punch in another's time card and by permitting Government witness Gibbs to state that he had no way of knowing whether or not the employee to whom the card was issued had in fact inserted it into the time clock. The only ground advanced for the inadmissibility of this evidence is that it enabled the Government to argue in closing that someone else may have punched defendant's time card at 9:07 p. m. on the night in question. We see no impropriety in admitting this evidence nor in the Government's closing argument based thereon. It was for the jury to decide whether or not defendant or his alibi witness Jenkins punched defendant's time card at that time. In his testimony defendant had ample opportunity to convince the jury that he was the one who punched it.

*Instructions*

■ After the jury retired, it asked the court for the definition of "embezzlement," the crime charged in this indictment. Thereupon the court re-read the indictment and its previous embezzlement instruction which was as follows:

"Embezzlement is the fraudulent appropriation of property by a person

to whom such property has been entrusted or into whose hands it has lawfully come."

This was government instruction 18 and accords with our definition of embezzlement in United States v. Jannsen, 339 F.2d 916, 918 (7th Cir. 1965), and resembles Mathes instruction 20.05 (27 F.R.D. 39, 148). Defendant did not even propose his own embezzlement instruction as required by Rule 30 of the Federal Rules of Criminal Procedure. Nevertheless defendant now claims that this embezzlement instruction was inadequate (without explaining why) and that the indictment should not have been re-read without repeating the cautionary instruction given earlier. Since no such objections were presented below, they will not be considered here, particularly in the absence of a tendered instruction. United States v. Vasen, 222 F.2d 3, 6 (7th Cir. 1955), certiorari denied, 350 U.S. 834, 76 S.Ct. 70, 100 L.Ed. 744; Rule 30, Federal Rules of Criminal Procedure.

▇ The defendant also claims that the court committed reversible error by refusing to give 13 of his tendered instructions. Our conclusion is that, except for proposed instruction 14, those matters were adequately covered by the instructions given. As to instruction 14, it was improper because it directed the jury that if two theories had been advanced, one for guilt and one for innocence, the jury "must adopt the innocence theory and acquit."

*Closing Argument of the Prosecutor*

▇ Defendant objects to prosecutor's statement in his closing argument that William Jenkins, defendant's coworker and alibi witness, might have been involved in the theft of mail and should have cooperated with the Government. The first statement was sufficiently justified by the evidence and the second was in reply to a matter raised by defense counsel in his closing argument. Therefore, no reversible error occurred. United States v. D'Antonio, 362 F.2d 151, 155 (7th Cir. 1966); United States v. Hamilton, 409 F.2d 404, 407

(7th Cir. 1969); United States v. Reid, 410 F.2d 1223 (7th Cir. 1969).

*Sufficiency of the Evidence*

 Finally, defendant urges that the evidence was insufficient to support the jury's verdict. The jury was of course entitled to disbelieve defendant's alibi defense. Our examination of the record satisfies us that there was ample evidence from which the jury could find that defendant was guilty.

Affirmed.