**UNITED STATES of America**

v.

**Aniello DELLA CROCE.**

**No. 79–6035–Cr–NCR.**

United States District Court,
S. D. Florida,
Ft. Lauderdale Division.

Nov. 7, 1980.

Fred A. Schwartz, U. S. Dept. of Justice, Miami, Fla., for plaintiff.

Maurice Brill, New York City, Henry Gonzalez, Miami, Fla., for defendant.

---

## FACTS

ROETTGER, District Judge.

A few months before his indictment *TIME* magazine described defendant, Aniello Della Croce as "the most prominent mobster in the U.S."[1] In May, 1979, defendant and the codefendant, Anthony Plate, were indicted under the Federal Anti–racketeering Statute, 18 U.S.C.A. 1962, *et seq.* Nearly all of the overt acts dealt with defendant Plate; only one charged any activities of defendant Della Croce.

In August, 1979, Anthony Plate and a long–time friend went on an errand in the friend's car. Neither Plate nor his friend, nor even the car has ever been seen again.

The disappearance of Anthony Plate under mysterious circumstances–which certainly included the possibility that Plate was avoiding prosecution–required lengthy delays in an effort to determine whether Plate could be located and, if not, whether he was still alive.

The court finally concluded that it was unlikely that Plate was going to be located and the case proceeded to trial.

The evidence against the missing defendant, Plate, was quite overwhelming. The evidence was admitted in the trial against defendant Della Croce, following a pretrial *James* hearing,[2] as evidence of the alleged conspiracy under the anti–racketeering statute. However, the evidence against Della Croce's actual participation in any criminal events was markedly limited. That evidence involved one incident in Lanza's restaurant in Manhattan in the Spring of 1974, described in overt act # 22, as follows: "In or about the year 1974, at the meeting in Lanza's Restaurant in New York City, New York, referred to in Overt Act No. 20, the defendant, ANIELLO 'Mr. O'Neill', 'Neil' DELLA CROCE, ordered the defendant, ANTHONY 'Tony', 'TP' PLATE, to kill Charles Calise".

There is one basic flaw in the government's case against Della Croce: he was in prison from 1973 to 1976. The jury deliberated for three days, repeatedly reporting itself deadlocked despite the court's finally giving the *Allen*, or "dynamite", charge. At the close of all the evidence the court reserved ruling on defendant's motion for judgment of acquittal. This motion is now before the court.

## THE BACKGROUND

The government's star witness was Peter Salerno, erstwhile leader of the "dinner–set burglars". Salerno spent his winters in South Florida burglarizing the homes of the "super–rich" by entry through the second story while the occupants were being served dinner on the main floor.

Although not large of stature, Salerno prided himself in his athletic ability and would gain admittance to the second floor of houses either by being hoisted there by a strong accomplice or by climbing a rope attached to a rubber–coated grappling hook.[3]

Salerno began as a burglar in 1964 and he estimated he pilfered more than 5 to 10 million dollars over the next few years. He was recognized as one of the promising young men in the underworld and was being groomed for better things in the Gambino family.

Unfortunately for Mr. Salerno, his career developed a few pitfalls and he was apprehended in burglaries and then sentenced before the undersigned judge in September of 1975 on allegations of conspiracy to distribute cocaine. After that, Salerno decided to cooperate with Government agents.

According to Salerno, sometime "in the spring of 1974" he returned to New York from South Florida as he did every spring. His brother–in–law, Stanzione, in Yonkers,

---

1. TIME, Nov. 13, 1978, p. 37.

2. *United States v. James*, 576 F.2d 1121 (5th Cir. 1978), recon. *en banc*, 590 F.2d 575 (5th Cir. 1979), *cert. den.* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

3. Only for illustrative purposes: Apparently Salerno disdained jogging around the baseball field at the Federal Penitentiary in Atlanta and instead circled the field by walking on his hands.

N. Y. had been a "street man" for Tony Plate and was one of the persons handling Tony Plate's loan–sharking activities in that area. Stanzione and his immediate boss, "Charlie Bear" Calise, had a dispute over money which had been fronted by Plate. The actual dispute was whether Stanzione owed Calise (and Plate in reality) $3,000, as Plate and Calise claimed, or only $1500 as Stanzione conceded he owed. The evidence was overwhelming that the monies were lent within the definition of loan sharking under the statute; for example: $100 lent received $120 repayment one week later. Both New York and Florida, the states where all events in evidence took place, have a maximum rate of 25% interest before it becomes criminal usury.

This dispute generated into an incredibly intense and involved imbroglio. Plate stationed two "goons" on Stanzione's lawn. Salerno found himself in the role of mediator between Stanzione, not only his brother–in–law but the driver of the "dinner–set burglars", and his usual mentor, Tony Plate. A number of efforts followed in an effort to mediate the dispute.[4]

Although Plate had been Salerno's mentor for years, Tom Greco, one of the higher–ups in the Genovese family in New York, had been making overtures to Salerno. Because the confrontation involved Plate, Salerno naturally went to Greco. On the day in question Salerno and Stanzione went to Lanza's, as did Greco and a lieutenant of his, Figorotta, who was a friend of Salerno's. When Plate approached, Figorotta and Salerno were standing outside and Figorotta exclaimed that Plate "has got Aniel with him", meaning Della Croce.

Salerno testified that a meeting took place inside; Calise was conspicuously absent. At a small dinner table Plate sat to Salerno's left, Della Croce across from him, and Tom Greco to his right. Stanzione sat at an adjacent table. The meeting lasted six or seven minutes and is the only evidence of Della Croce's involvement.

Salerno's description of the meeting: After the preliminary discussion of the debt of $3,000 vis–a–vis $1500 Greco slowly rolled a cigar around in his fingers and said to Plate: "You're talking about this man [Stanzione] and his $3,000 but you've got a man [referring to Calise] with you who steals $150,000 to $200,000 and talks to bad people." [Translate "bad people" in this context as the police or F.B.I.].[5]

At that moment defendant Della Croce finally enters into the conversation and asks, "Tony, could this be possible?" Plate: "It could be." Della Croce: "Then get rid of him. Kill him." Plate: "I will; I will kill him."

Several weeks later,[6] on July 7, 1974, Charlie Calise was found dead, lying head down in the back seat of a car with two bullets through his eyes, two through his ears, and one in his mouth—the classic underworld symbolism for a man who saw too much, heard too much and talked too much. As a final indignity, Calise's shirt was pulled to his armpits and his trousers to his knees.

## DEFENDANT'S CASE

Defendant's case essentially was a three–pronged attack in support of his defense of alibi.

(1) Lanza's restaurant.

Michael Lanza, the owner of Lanza's restaurant, a family restaurant for many decades, narrated that the restaurant was never opened on Mondays (the date of one of the meetings about the Plate vs. Stanzione confrontations before the meeting where

---

4. The testimony about the meeting was elicited from Salerno and accepted by the court for purposes of this motion. Finally, Salerno promised Plate he would be paid his $3,000 and a meeting was set up in Lanza's restaurant in lower Manhattan, a frequent meeting place for "organized crime figures" according to Salerno.

5. Calise had somehow diverted that much money to his own uses and lost it through gambling; additionally, he was cooperating with law enforcement authorities.

6. The only specific measure of the time interval between the meeting and Calise's slaying was expressed by Salerno at "seven weeks."

Della Croce allegedly was present). He also testified that defendant Della Croce had never been in his restaurant. The credibility of Salerno's testimony was further attacked by Lanza's testimony that Greco came to the restaurant every day to eat but that Greco had left New York and Lanza last saw him in 1970.

This defense however raises the issue of the credibility of Salerno's version vis–a–vis Lanza's testimony and is clearly a jury question.

(2) Thomas Greco's alleged participation.

Greco, who died in May, 1975, in Hollywood, Florida, saw his dentist every other month in 1973 and 1974. The dentist testified that Greco could possibly walk without assistance if he used a cane but that he was usually helped by an aide.

Greco's doctor who had treated him for ten years testified that Greco had great trouble in walking the last two years. He also opined that walking would have been very difficult for Greco in 1974 because the doctor usually had to see him at home. He added he never saw Greco smoking in his last years and that cabin pressurization of an aircraft would have been dangerous to Greco. Because of Greco's anemia he doubted Greco could have flown in the last two years of his life.

Greco's daughter testified that her father never left the South Florida area after moving here in 1972.

This defense also raises the issue of the credibility of Salerno's version vis–a–vis the defense witnesses. It is clearly a jury question.[7]

(3) Defendant's incarceration during the time of the meeting in Lanza's restaurant.

Defendant arrived at Atlanta prison to begin serving a sentence for income tax evasion on July 11, 1973. He remained there until February 22, 1974 when he was picked up by State officers under subpoena to appear in the State courts in New York.

On the 23rd of February, 1974 he was received at the Brooklyn House of Corrections. On March 1, 1974 he was booked out and back in the same day; the same thing happened on March 25th and April 9th, 1974 but no furloughs were permitted for detainees, such as Della Croce.

Della Croce was returned to Atlanta prison from New York on April 11, 1974 and not permitted out until his release in August, 1976, except for one day in 1975 when he received dental treatment.[8] Della Croce received no furloughs during his stay in Atlanta.

All of the witnesses as to defendant's incarceration were prison officials of the Federal Bureau of Prisons, or New York City Department of Correction employees, or employees of the U. S. Parole Commission. The evidence as to dates of incarcerations, transfers, lack of furloughs, etc. was all documentary evidence from government records.

It is this aspect of the alibi defense that raises the critical question whether the government has presented evidence excluding every reasonable hypothesis of innocence.

### GOVERNMENT'S PROFFER ON REBUTTAL

On rebuttal the government proffered it would offer testimony that other persons confined in the New York City prisons had received either special treatment or had had overnight privileges or been able to have some degree of personal freedom during work–release programs. Unfortunately for the government's case, such evidence involved the years 1973 and 1975 rather than 1974 and involved persons other than Della Croce.

---

7. So, too, is a sub–defense as to Stanzione's whereabouts. The Veterans' Administration Medical Center in Miami has Carmine Stanzione's records. The first entry is February 21, 1974 for an ear treatment but there were no further entries in March or April up until May of 1974.

8. From two different inspection visits to Atlanta prison, the court has concluded it is the "big–house" in the Federal prison system, at least in the eastern part of the country.

The court concluded at the trial that the government failed to clear the initial evidentiary hurdle of relevance. Post–trial reflection and consideration of the matter does not cause the court to reverse its ruling; if the court had concluded it was in error in rejecting the testimony, the court would deny the defendant's motion and set the matter for re–trial.

## CONCLUSIONS OF LAW

In keeping with the general tenor of this fascinating case, the court is presented with an intriguing question of law. Apparently an issue of first impression, the question presented is whether alibi evidence, consisting of official prison records indicating that defendant was incarcerated at the time of an alleged offense, requires the granting of defendant's motion of judgment of acquittal where an eyewitness' testimony unequivocally places defendant at the scene of the alleged crime.

A judgment of acquittal may be entered by the court on motion of the defendant where "the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). On the other hand whether to believe or disbelieve alibi evidence is typically a question for the jury. *United States v. Spoonhunter*, 476 F.2d 1050 (10th Cir. 1973); *United States v. Depalma*, 414 F.2d 394 (9th Cir. 1969).

The question presented to the court can only be resolved through an examination of the law which surrounds each of the conflicting principles. Turning first to the standard to be applied when considering a motion for judgment of acquittal:

"[I]f the trial or appellate court is satisfied that the jury could not conclude that the evidence fails to exclude every reasonable hypothesis but that of guilt then the trial court or appellate court must necessarily have had a reasonable doubt as to the inconsistency;" *United States v. Haggins*, 545 F.2d 1009, 1012 (5th Cir. 1977), *quoting United States v. Nazien*, 504 F.2d 394, 395 (5th Cir. 1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975).

The standard to be applied is the same whether the court is considering the motion before submission to the jury, or after the jury returns a guilty verdict. *United States v. Gonzalez*, 617 F.2d 104 (5th Cir. 1980); *United States v. Whiteside*, 404 F.Supp. 261 (D.C.Del.1975). Additionally, a trial court or appellate court "must consider the evidence in the light most favorable to the government and credibility choices in favor of the verdict." *United States v. Gonzalez, supra*, at 106.

Unfortunately, equally recent 5th Circuit decisions described the standard differently in terms of the existence of a reasonable hypothesis of innocence: "Whether the evidence is direct or circumstantial the test is not whether the evidence excludes every reasonable hypothesis other than that of guilt, but whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of innocence." *United States v. Smith*, 548 F.2d 545 (5th Cir. 1977), *quoting United States v. Wayman*, 510 F.2d 1020, 1026 (5th Cir. 1975), *cert. denied*, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975). The same analysis has quite recently been applied in *United States v. Gonzalez, supra*, in which the court concluded that a motion for judgment was properly denied where "(a) reasonably minded jury could find beyond a reasonable doubt and to the exclusion of any other reasonable hypothesis", that the defendant had committed the offense. *Id.* at 106.

As previously mentioned, defendant Della Croce introduced alibi evidence supporting his claim that he was incarcerated at the time of the alleged offense and as noted at the outset this is classically a question for the jury. In every case where alibi evidence is presented it is in conflict with direct evidence of involvement:

"Therefore, if any one fact necessary to the conclusion is wholly inconsistent with the hypothesis of guilt of the accused, it breaks the chain of . . . evidence; and however plausible or apparently conclusive the other circumstances may be, the charge must fail. Of this character is the

defense usually called an alibi; that is the accused was elsewhere at the time the offense is alleged to have been committed. If this is true, it being impossible that the accused could be in two places at the same time it is a fact inconsistent with that sought to be proved, and excludes its possibility." *Com. v. Webster*, 5 Cush. 295, 318 (Mass.1850).

■ Defendant's alibi evidence took the form of prison records indicating that he was incarcerated in state and federal penal institutions at the time the meeting at Lanza's restaurant is alleged to have occurred. These records were admitted under the official records exception to the hearsay rule. Fed.R.Evid. 803(8). Alibi evidence of this sort is quite strong because official government records are cloaked with a presumption of validity. Because of the trustworthy nature of the evidence offered under Rule 803(8), it is admissible without the declarant testifying. *United States v. Ghaloub*, 385 F.2d 567, 571 (2d Cir. 1966).

■ The court faces these questions. In applying the appropriate standard to defendant's motion for judgment of acquittal, should the court find that reasonable minds could reject the alibi evidence and convict on the basis of the government's evidence? Or must the court find that reasonable minds would conclude that the evidence of alibi compels the conclusion that a reasonable doubt exists?

After a diligent search, the court is convinced that there is no reported case on all fours with the instant one. There are two cases in which defendants have offered alibi evidence consisting of records or documents. Both cases suggest that the proper course in such a situation is to deny a motion for judgment of acquittal.

In *United States v. Alexander*, 415 F.2d 1352 (7th Cir. 1969), the defendant postal employee had been convicted of embezzling pieces of mail despite offering alibi evidence that the time stamped on his time card demonstrated that it was impossible for him to have committed the offense. Over the defendant's objection the trial judge permitted the defendant's alibi witness to testify on cross–examination that he had no way of knowing whether the defendant had actually punched his own time card. In concluding that the evidence had been properly admitted and that the government's closing argument suggesting that someone else may have punched the defendant's time card was not prejudicial, the court stated: "We see no impropriety in admitting this evidence nor in the government's closing argument based thereon. It was for the jury to decide whether or not defendant or his alibi witness . . . punched defendant's time card at that time. In his testimony defendant had ample opportunity to convince the jury that he was the one who punched it." *Id.* at 1357. (Note: defendant took the stand and credibility of this alibi witness was clearly an issue for jury.)

Similarly, in *United States v. Tiche*, 424 F.Supp. 996 (W.D.Pa.1977), at a non–jury trial the defendant introduced alibi evidence to establish he was elsewhere at the time of the alleged offenses. The evidence took the form of printout time sheets from a college indicating that defendant was at college at the time of the offense, a pocket calendar kept by defendant, and a phone bill indicating that a phone call was placed from defendant's residence to his father–in–law's residence. The district court resolved all these issues of credibility in favor of the government, and denied the motion for judgment of acquittal. The court concluded, for purposes of ruling on the motion, that defendant or another person could have falsified the documents introduced, and that there was no direct evidence tending to show that defendant had placed the call to his father–in–law.

However, in this case, the evidence presented differs from *Alexander* and *Tiche* in one significant respect. Here no inference can be drawn in favor of the government's case which reconciles the two conflicting hypotheses. The government offered no relevant evidence tending to show that defendant Della Croce availed himself of an opportunity to attend the alleged meeting at Lanza's restaurant. Surely, rea-

sonable minds could not conclude "that the evidence is inconsistent with the hypothesis of innocence." *United States v. Smith, supra.*

The court hastens to add that in reaching its conclusion it has not found the government's witnesses to be lacking in credibility. Here the scales are tipped in favor of the defendant by the compelling nature of the alibi evidence and the fact that the government could offer no relevant evidence rebutting the presumption of validity that prison records are entitled to.

## CONCLUSION

The court concludes its ruling on the government's proffered rebuttal evidence was correct: The testimony was simply too remote to be relevant.

Looking then to the evidence presented by the government's case–in–chief and *only* the alibi evidence as to defendant's being incarcerated at the time of the 1974 meeting at Lanza's the court concludes the same result must be reached regardless of which Fifth Circuit standard is applied: Reasonable minds must necessarily entertain a reasonable doubt of defendant's guilt. Defendant's motion for judgment of acquittal is granted.