UNITED STATES of America, Appellee,

v.

William D. STOCKTON, also known as Bubba, Appellant.

UNITED STATES of America, Appellee,

v.

Gary Wayne BADLEY, Appellant.

Nos. 91–2547, 91–2552.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1992.

Decided July 6, 1992.

Rehearing Denied Aug. 17, 1992.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and LOKEN, Circuit Judge.

McMILLIAN, Circuit Judge.

Gary Wayne Badley and William D. Stockton (collectively "defendants") appeal from final judgments entered in the United States District Court [1] for the Western District of Missouri, upon jury verdicts, finding them guilty of involvement in a conspiracy to manufacture methamphetamine. Badley was found guilty of one count of conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C.A. § 846 (West Supp.1992) and one count of possession of a three-neck, round-bottom flask with the intent to manufacture methamphetamine in violation of 21 U.S.C. § 843(a)(6). Badley was sentenced to 235 months imprisonment on the conspiracy count and 48 months, to be served concurrently, on the possession of a flask count; five years supervised release on the conspiracy count and one year supervised release, to be served concurrently, on the possession of a flask count; and a special assessment of $100.00. Stockton was found guilty of one count of conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C.A. § 846 (West Supp.1992). Stockton was sentenced to 235 months imprisonment, five years supervised release, and a special assessment of $50.00.

For reversal, Badley argues that the district court erred in (1) denying his motion for acquittal on the basis that multiple conspiracies were shown and (2) determining his base offense level. For reversal, Stockton argues that the district court erred in (1) denying his motion for severance of trial, (2) admitting photographs in violation of the Best Evidence Rule, (3) determining his base offense level, and (4) denying him a two-level reduction for acceptance of responsibility. For the reasons

Mark E. Maddux, Springfield, Mo., argued, for Stockton and Donald R. Cooley of Springfield, Missouri.

Gregory K. Johnson, Springfield, Mo., argued, for appellee.

1. The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri.

discussed below, we affirm the judgments of the district court.

## BACKGROUND

This case involves a conspiracy to manufacture and distribute methamphetamine. In August 1989, the police received information about an unpleasant odor and laboratory equipment in a rented house at 2606 Allen Drive in Greene County, Missouri. Police, accompanied by the owner of the home at 2606 Allen Drive, searched the residence and recovered laboratory equipment, precursor chemicals, and methamphetamine. Notes were also recovered which contained references to "Bubba." According to the government's theory of the case, Stockton, who was called "Bubba," was a "cook" for the conspiracy and "cooked" methamphetamine at the house on Allen Drive. Stockton and "Darrell"[2] would "cook" methamphetamine about once a week, making up to twelve ounces each time, in exchange for cash and drugs. Terry Glen Appleby and others were involved in the distribution of the methamphetamine. Some of the laboratory equipment for the Allen Drive laboratory was kept at a private storage company in Missouri, and a search of the storage area turned up glassware and precursor chemicals for making methamphetamine.

In April 1990, Appleby and Badley attempted to order glassware and precursor chemicals from Brookside Toy and Hobby. A shop employee contacted the Drug Enforcement Administration (DEA), which commenced an undercover operation. Various undercover DEA agents negotiated with Appleby and Badley for the sale of glassware and precursor chemicals. DEA agents had numerous phone calls and meetings with Appleby and Badley. Tapes of conversations were introduced at trial as was a videotape of Appleby and Badley inspecting the glassware that the undercover DEA agents had acquired for them. Badley negotiated with the DEA agents for the purchase of a 110–pound drum of phe-

nylacetic acid (PA) and other precursor chemicals. Badley also told the DEA agents that he had purchased two other 110–pound drums of PA. Undercover agents met the defendants in various hotels to sell glassware and precursor chemicals. During a search of Badley's hotel room,[3] DEA agents recovered a book entitled "Secrets of Methamphetamine Manufacturing" by Uncle Fester and a weight set, as well as a loaded handgun and a motel receipt from Chanute, Kansas.

Evidence was also obtained from methamphetamine laboratories operated in Kansas. A house in Thayer, Kansas, was rented to Appleby. Notes with references to "Bubba" (Stockton) were found in Kansas, and witnesses identified Badley as paying electric bills for the house containing the methamphetamine laboratory in Kansas. A storage facility was also rented in Kansas by Appleby. DEA agents searched this facility and seized laboratory glassware and precursor chemicals.

Originally six defendants were charged, but charges against one were dismissed pre-trial and one received a judgment of acquittal. Defendants Badley, Stockton, Rippy[4] and Appleby were convicted. This appeal involves Badley and Stockton whose cases were consolidated for appeal. Stockton was charged and convicted of one count of conspiracy to manufacture and distribute methamphetamine. Badley was charged with five counts. Badley received a judgment of acquittal on one count of travelling in interstate commerce to facilitate manufacturing and was found not guilty on two counts of manufacturing methamphetamine. Badley was found guilty of conspiracy to manufacture and distribute methamphetamine and possession of a three-neck, round-bottom flask with the intent to manufacture.

## DISCUSSION

### Existence of Multiple Conspiracies

■ Badley argues that the evidence at trial showed multiple conspiracies, not a

---

**2.** Darrell's last name is unknown and he was indicted, but remains a fugitive.

**3.** Defendants raise no suppression arguments in this appeal.

**4.** Defendant Pixie Leva Rippy did not appear for sentencing and is a fugitive from justice.

single conspiracy, and, therefore, the district court should have directed a verdict of acquittal on the conspiracy charge. Badley argues that no evidence connected him to the activity at the Allen Drive residence and the private storage facility. Therefore, Badley argues that activity constituted a separate conspiracy from his attempt to purchase glassware in Kansas City with Appleby and the activity in Kansas. Badley admits that evidence connected him with Appleby and the purchase of laboratory glassware and precursor chemicals, but argues that there was no evidence to connect him with the methamphetamine laboratory in Thayer, Kansas.

The government argues that there was sufficient evidence for the jury to find a single conspiracy existed. The district court instructed the jury that if it found multiple conspiracies instead of the single conspiracy charged in the indictment, it should acquit on the conspiracy count.[5] The government argues that the majority of the conspirators remained the same throughout the course of the conspiracy. The government argues that different members of the conspiracy had different roles, that is, while Stockton "cooked," Badley obtained glassware and chemicals.

We agree that there was sufficient evidence for the jury to find a single conspiracy. Appleby was involved with the methamphetamine laboratory on Allen Drive and also purchased chemicals and glassware with Badley. Additionally, evidence from the Kansas laboratory showed that Badley dropped off utility payments for Appleby's Thayer, Kansas, home where the methamphetamine laboratory was housed. Additionally, other members of the conspiracy, such as Pixie Rippy, were involved in all aspects of the conspiracy's activities. Based on this evidence, it was reasonable for the jury to find one single conspiracy which included the activity at the Allen Drive residence as well as the residence in Thayer, Kansas.

*Motion for Severance*

■ Stockton argues that the district court erred in denying his motion for severance. Stockton argues that because he was only charged with Count I (conspiracy) of a five count indictment, all of the evidence on the other counts was irrelevant to him and had a negative spill-over effect.

The government argues that because there was no showing of real prejudice, severance was not required. The government argues that Stockton was a key member of the conspiracy because he was a "cook" at the methamphetamine laboratory on Allen Drive. Additionally, notes found in the Thayer, Kansas, methamphetamine laboratory referred to "Bubba last two cooks." Finally, the government argues that because the jury was instructed that if it found multiple conspiracies, it should acquit the defendants of the conspiracy count, the jury's finding of one conspiracy shows that severance would not have been appropriate.

■ Federal Rule of Criminal Procedure 8(b) provides that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." This court reviews a district court's denial of a motion for severance under the abuse of discretion standard. *E.g. United States v. Sweeney*, 817 F.2d 1323, 1325 (8th Cir.), *cert. denied*, 484 U.S. 866, 108 S.Ct. 189, 98 L.Ed.2d 141 (1987). We hold that the district court did not abuse its discretion in denying the motion for severance. When defendants are charged with a conspiracy, there is a presumption that they will be tried together. *See United States v. O'Meara*, 895 F.2d 1216, 1218–19 (8th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990). Stockton supplied no examples or

---

5. Instruction No. 27 first explained what type of evidence may be used to prove a conspiracy. The instruction then read:

Even if the evidence in the case shows that the defendant was a member of some conspiracy, but that this conspiracy is not the single conspiracy charged in the indictment, you must acquit the defendants.

Unless the government proves the existence of the single [umbrella] conspiracy described in the indictment beyond a reasonable doubt, you must acquit the defendant.

evidence of any prejudice from this joint trial. Additionally, evidence linked Stockton to both the methamphetamine laboratory on Allen Drive and the one in Thayer, Kansas. Therefore, there was nothing improper about his being tried in a joint trial with his co-conspirators.

### Best Evidence Rule

■ Stockton argues that Exhibits 74–H and 74–I, which were photographs of miscellaneous papers found in the Thayer, Kansas, residence, were admitted in violation of the Best Evidence Rule, Fed.R.Evid. 1002.[6] During a search of Appleby's residence in Thayer, Kansas, photographs were taken of "miscellaneous papers" and these photographs were introduced at trial (Exhibits 74–H and 74–I). According to Stockton, the government provided no reason why the originals could not be produced, and, therefore, the district court's admission of the photographs violated the Best Evidence Rule.

The government argues that the Best Evidence Rule does not apply to photographs of demonstrative evidence.

■ We hold that the Best Evidence Rule does apply in this situation, but that the photographs were properly admitted as duplicates under Fed.R.Evid. 1003. While the government is correct that the Best Evidence Rule does not usually apply to photographs, this case is one of "those relatively rare instances in which [the photographs'] contents are sought to be proved." John W. Strong et al., *McCormick on Evidence* § 232, at 65 (4th ed. 1992).[7] During the government's case-in-chief, Harley Sparks, a special agent with the DEA, testified to the contents of the photographs and specifically read from the photographs. Therefore, the contents . of the photographs were at issue in this case.

These photographs are not the original documents and therefore violate Fed. R.Evid. 1002. But the analysis does not end there because Fed.R.Evid. 1003 allows duplicates to be introduced in the same manner as originals "unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." This rule allows photocopies or carbon copies to be introduced in lieu of the original documents unless there is a genuine challenge to the authenticity of the document. John W. Strong et al., *McCormick on Evidence* § 236, at 74–75 & n. 12; *see e.g., Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d 926, 928 (8th Cir.1984); *United States v. Gipson*, 609 F.2d 893, 894 (8th Cir.1979) (per curiam); *United States v. Rangel*, 585 F.2d 344, 346 (8th Cir.1978) (per curiam); Janet Boeth Jones, *Admissibility of Duplicates Under Rules 1001(4) and 1003 of the Federal Rules of Evidence*, 72 A.L.R.Fed. 732, §§ 2, 3(a) (1985). We see no distinction between a photocopy and the photographs used in this case. Photographs of notes were taken by DEA agents during a lawful search and one of the agents testified to contents of the photographs. No question was raised below as to the authenticity of the photographs so that exception is not at issue in this case. We hold, therefore, that the district court did not abuse its discretion in admitting the photographs which were admissible as duplicates in lieu of the original documents pursuant to Fed. R.Evid. 1003.

### Determination of Base Offense Level

■ The district court found defendants were responsible for between 30 kilograms and 100 kilograms of methamphetamine

---

**6.** Fed.R.Evid. 1002 provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress."

**7.** The government argues that the Best Evidence Rule does not apply to photographs because they are demonstrative evidence. For example, in *United States v. Alexander*, 415 F.2d 1352, 1357 (7th Cir.1969), *cert. denied*, 397 U.S. 1014, 90 S.Ct. 1246, 25 L.Ed.2d 427 (1970), the Best

Evidence Rule did not apply to a photograph of stolen mail because "[t]he photograph was introduced to show the quantity of mail seized at the time of arrest and not for the purpose of demonstrating anything about the contents of the particular letters." The photographs introduced in the present case were introduced to prove the contents of the writings which they represented, and, therefore, the Best Evidence Rule is applicable.

and this quantity resulted in a base offense level of 38. U.S.S.G. § 2D1.1(c)(3) (1990). The district court based this finding on the Presentence Report which found that (1) in the methamphetamine laboratory on Allen Drive, defendants were able to produce 5.4 kilograms of methamphetamine and (2) with the three empty 110–pound drums of PA, at a 50 percent yield, defendants were able to produce 75 kilograms of methamphetamine. At the sentencing hearing, Stockton admitted manufacturing 7 pounds of methamphetamine at the Allen Drive laboratory and that defendant "Darrell" had "cooked" another 5 pounds, for a total of 12 pounds or 5.4 kilograms. Evidence at the sentencing hearing showed that three empty or partially full 110–drums of PA were seized during the investigation: one was from a private storage facility in Missouri, one from a private storage facility in Chanute, Kansas, and one from the Thayer, Kansas, laboratory site. A DEA chemist testified that on the basis of the glassware and samples found at the laboratories, a 50 percent yield of methamphetamine from PA would be very conservative. Based upon the empty drums and a 50 percent yield rate, the DEA chemist estimated that defendants would have been able to produce 75 kilograms of methamphetamine.

Defendants argue that they were responsible for a much smaller quantity of methamphetamine.[8] Stockton argues that the evidence only showed that 7 pounds was produced at the Allen Drive laboratory. Badley argues (1) that there was no evidence that an empty 110–pound drum of PA was found in Chanute and (2) that the drum from the Missouri private storage facility should not have been counted.[9] Additionally, defendants argue that their expert chemist estimated that defendants would only have obtained a 30 percent yield.

The government first argues that the evidence supports the district court's findings. Second, the government argues that, even accepting defendants' allegations, the base offense level would not change because the range is between 30 and 100 kilograms. The government argues that the district court found even using a 30 percent yield, excluding the drum seized from the Missouri private storage facility, and accepting only 7 pounds from the Allen Drive laboratory, the base offense level would still be 38. Additionally, the government argues that the district court found that, even using only one drum of PA at a 50 percent yield and the 5.4 kilograms from the Allen Drive laboratory, the base offense level would be 38.

This court reviews the district court's factual determinations under the clearly erroneous standard. We hold that the district court did not abuse its discretion in determining that defendants' base offense level was 38. With respect to the disputed five pounds produced at the Allen Drive laboratory, the district court could have reasonably relied on Stockton's statement that "Darrell" probably "cooked" another five pounds. As to the existence of an empty drum of PA in Chanute, Kansas, the district court could have reasonably relied on the testimony of a Kansas agent and two chemists who observed the seized drum. Additionally, Badley, during negotiations with undercover agents, admitted that he had previously purchased two 110–pound drums of PA. The evidence supports the district court's calculation that defendants produced significantly more than 30 kilograms, the minimum for a base offense level of 38, and therefore, the district court did not err in determining defendants' base offense level.

8. Defendants argue that because they were only involved in part of the conspiracy, they cannot be held responsible for the quantity produced by the entire conspiracy. We held *infra* that there was sufficient evidence for the jury to find a single conspiracy, and, therefore, each conspirator can be sentenced on the basis of the entire quantity of drugs that was known to or was reasonably foreseeable by the defendant to be involved in the conspiracy. *United States v. Drew*, 894 F.2d 965, 973 (8th Cir.), *cert. denied*,

494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990); U.S.S.G. § 1B1.3(a)(1) & n. 1 (1990).

9. It is unclear why Badley argues that the empty drum from the Missouri private storage facility should not have been counted. He argues that the district court agreed it should not have been counted. In reality, the district court said that even if it was not counted, Badley's base offense level would have been 38.

### Acceptance of Responsibility

■ Stockton argues that the district court erred in denying him a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 (1990), because at his sentencing hearing he admitted purchasing 75 pounds of precursor chemicals.

This court "must give great deference in reviewing a [district] court's determination of acceptance of responsibility." *United States v. Thompson*, 876 F.2d 1381, 1384 (8th Cir.), *cert. denied*, 493 U.S. 868, 110 S.Ct. 192, 107 L.Ed.2d 147 (1989). Stockton only admitted to partial involvement in the conspiracy and only to a limited portion of the methamphetamine manufactured. The government argues that Stockton initially declined to discuss his involvement in the case and later admitted to cooking only seven pounds of methamphetamine. This amount is much less than the evidence established at trial and thus indicated that Stockton did not fully accept responsibility for his conduct. Additionally, the government argues that Stockton denied being in Kansas City to negotiate the purchase of laboratory equipment, in contrast to the evidence adduced at trial. Accordingly, we hold that the district court did not abuse its discretion in denying Stockton the reduction for acceptance of responsibility.

Accordingly, we affirm the judgments of the district court.

BRIGHT, Senior Circuit Judge, concurring separately.

I write separately to comment about the cruel sentences imposed on Stockton and Badley, and to observe that, although not illegal, these sentences emanate from a law gone awry.

Sentences ought to balance punishment with societal needs as well as some concern for the offender. Under the sentencing guidelines, a judge can exercise little, if any, judgment on these matters. The probation officer computes the sentence; the judge generally only ratifies it.

In this case, both offenders will serve nearly twenty years in prison for their first offenses. Stockton, now only age twenty-six, will be forty-five years old when he emerges from prison. Badley, now age forty-four, will be sixty-three years old when he is released, assuming he can survive that long. The cost to the government and its taxpayers will be approximately $680,542 (38 years times $17,909; this figure does not include inflation).[1] The suffering imposed on these men and their families cannot be calculated in monetary terms.

In my judgment, this sort of massively heavy punishment cannot be justified in a civilized society, unless there is a showing that lengthy incarcerations protect society from incorrigible and continuing criminals.

No such showing has been made in this case.

As our federal prisons, already at 165% capacity,[2] include non-violent first-time offenders, many serving near-life sentences, they begin to resemble the barbaric Turkish prisons depicted in the 1978 academy-award-winning motion picture *Midnight Express*.[3] That film shocked the public by presenting the true story of a young American tourist named Billy Hayes who was arrested in Turkey for heroin smuggling and sentenced to thirty years in prison by the Turkish courts. The public should be similarly shocked if it knew of the excessive sentences that can be and are imposed on first-time offenders.

The Sentencing Commission has created a system for punishing drug offenders based almost solely on the weight of drugs, and not based on the criminality of offenders. This system runs counter to the Con-

1. *See United States v. Quarles*, 955 F.2d 498, 505 n. 6 (Bright, J., concurring and dissenting).

2. Daniel J. Freed, *Federal Sentencing in the Wake of the Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 Yale L.J. 1681, 1700 n. 102 (1992) (citing Attorney General William P. Barr, Remarks to the California District Attorneys Association (Jan. 14, 1992)).

3. The United States incarcerates more than one million people, a larger share of its population than any other nation, according to the Sentencing Project, a non-profit research organization. *United States Leads in Imprisonment*, St. Louis Post–Dispatch, Jan. 6, 1991, at 6E.

gressional directive that this court shall impose a sentence that is sufficient, "but not greater than necessary to comply" with the sentencing objectives established by Congress. 18 U.S.C. § 3553(a) (1988); *see also United States v. England,* 966 F.2d 403, 411 (8th Cir.1992) (Bright, J., concurring); *United States v. Quarles,* 955 F.2d 498, 505 (8th Cir.1992) (Bright, J., concurring and dissenting).

Although the Sentencing Commission and Congress, in their war on drugs, intended to use long sentences as weapons to deter drug crime, doubt exists that longer sentences have had any deterrent effect on crime. *See* Freed, *supra* note 2, at 1707; Andrew Ashford, *Sentencing Purposes in England,* 3 Fed.Sent.Rep. 337, 338 (1991). These excessively long sentences mandated by the guidelines waste the lives of many men and women. Yet, can we say we are winning the war on drugs? It is time for a new and more rational look at sentencing. *See, e.g.,* Gerald W. Heaney, *The Reality of Guideline Sentencing: No End to Disparity,* 28 Am.Crim.L.Rev. 161 (1991).

While I am obligated to affirm the sentences, I need not put my stamp of approval on them.