THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KEITH SPRINKLE *et al.*, Defendants.—(BRUCE SPRINKLE, Defendant-Appellant.)

Fourth District    No. 15309

Opinion filed August 7, 1979.

Richard J. Wilson and Daniel Yuhas, both of State Appellate Defender's Office, of Springfield, for appellant.

Edward Y. Crandall, State's Attorney, of Rushville (Marc D. Towler and Larry Wechter, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE MILLS delivered the opinion of the court:

A singularly gruesome, vicious act of mayhem.

Jury verdict of guilty to attempted murder, sentenced to 7 years' imprisonment and a $5,000 fine.

We affirm across the board.

Bruce Sprinkle was charged with the offense of attempted murder. This is the way the events unfolded at the jury trial:

Douglas Kettering, a Rushville farmer, testified that at approximately 2:30 p.m. on March 7, 1978, he received a telephone call from his neighbor, Leola Ward, who asked him to help a pickup truck that had slid into a ditch near her home. Kettering agreed to help and drove to the disabled truck through the bitter cold and heavy snow that had accumulated on the ground.

When Mr. Kettering first saw the truck that was in the ditch, Richard Swann was in the driver's seat, Bruce Sprinkle was in the middle, and Keith Sprinkle was in the right-hand seat. Kettering asked if they needed assistance and both Richard and Keith indicated that they would appreciate help in getting out of the ditch. Kettering then attached his own pickup truck to the incapacitated truck and attempted to pull it out of the ditch, but was unable to obtain sufficient traction to extract it. Kettering told Keith that he would get a large bale of hay and place it in the back of his truck for additional weight and traction. Kettering drove off, returned with the hay, and again attempted to dislodge the truck, but once again was unsuccessful.

Kettering then told Keith that the only additional help he could offer would be to drive them to a place where they could obtain assistance. The

defendant—who had previously remained in his truck—approached his brother and Kettering at this time. Kettering was then engaged in a conversation with the Sprinkle brothers who became very belligerent, swore at him, and accused him of not doing enough to help them.

Kettering recalled that Bruce was extremely belligerent and very hostile as Kettering gathered up his chain and rope. Keith then confronted Kettering and said, "You no good son-of-a-bitch, you hurt our friend." Kettering asked how he could have hurt his friend when he was behind the wheel of his pickup. At that time Keith allegedly said, "We kill son-of-a-bitches that hurt our friends," and Bruce said, "Kill the son-of-a-bitch," and began hitting Kettering in the side with his fist. Keith reached over and grabbed the scoop shovel from the back of Kettering's truck and began slamming him with the broad side of the scoop while Bruce continued hitting him with his fists. They kept repeating the threats, "We are going to kill you, you son-of-a-bitch. You never even tried to pull us out of the ditch."

Kettering testified that he eventually pushed the defendant and his brother away and managed to get into his truck. The engine was running and Kettering pushed the gear shift lever into drive. The truck pulled away but spun into a nearby ditch. Kettering then closed and locked his door, rolled up the windows, and tried unsuccessfully to get his truck out of the ditch.

Meanwhile, Keith, Bruce, and Richard Swann rushed toward the truck. Keith began to break the driver's window with the shovel. Bruce climbed into the back of the truck, picked up a hammer from a bucket, and began breaking the back glass in the truck while yelling, "Kill the son-of-a-bitch" and "We hate your guts." At the same time, Swann went to the front of the pick-up, opened the hood, and disabled the engine.

After Keith had broken out the driver's window, he began beating Kettering in the face and on the forearms with the shovel. Once the defendant had broken out a portion of the back window with the hammer, he attempted to hit Kettering with it but the hammer flew out of his hand inside of the cab. The defendant then proceeded to break out the rest of the window with the bucket, all the while threatening to murder Kettering.

Kettering next recalled switching on the CB radio and calling for help. As he was talking on the CB, he was facing Keith on the driver's side, and out of the corner of his eye he saw Bruce "take a knife and come through the window." He felt Bruce start to cut his throat and at the same time heard him shout, "Kill the goddamn son-of-a-bitch." Bruce continued cutting Kettering's throat with the knife, slicing up over the chin and exiting close to his mouth.

(At this point, Kettering was then asked by the prosecutor, "Now,

from your point of observation in that cab, what was the defendant trying to do?" Defense counsel objected to this question, renewing the assertions he had made in a previous motion *in limine*, and emphasizing that such a question by the prosecutor would improperly allow Kettering to give opinion testimony on the ultimate factual issue before the jury. The trial judge overruled defendant's objection and Kettering told the jury that "Bruce Sprinkle attempted to slit my throat.")

Kettering testified that the attack on him continued with the defendant, Bruce Sprinkle, reaching in with the knife, stabbing him in the side and ribs, and ripping up his clothing. According to Kettering, the defendant exclaimed, "Let me finish killing the son-of-a-bitch," and began "coming through the back window with his head and shoulder with his knife to stab me." At this point, Kettering grabbed a heavy pair of fence pliers that were in his truck cab and struck the defendant in the head. This blow stunned the defendant (and apparently surprised his companions) so that Kettering was able to jump from his truck and flee from his assailants. He ran to Leola Ward's house and told her, "They are trying to kill me." She tried to stop the bleeding while they waited for help to arrive.

Bruce Sprinkle testified that on the morning of the altercation, he had begun drinking at approximately 10 a.m. and that he had consumed a large quantity of beer and whiskey by the time he first approached Kettering. His version was that an argument ensued when Kettering made derogatory comments about him and his brother and drove over the leg of Richard Swann. The argument then escalated to the point where Keith Sprinkle was striking Kettering with a shovel while the defendant was cutting Kettering with a knife in the jaw and upper neck. The defendant stated that Kettering struck him in the back of the head *prior* to the time he stabbed Kettering. The defendant also received a blow to the chin which he thought came from Kettering. He further testified that his consumption of alcohol prevented him from remembering many specifics about his encounter with Kettering. He stated that—although he did cut Kettering—he never intended to take his life.

After the jury found him guilty of the offense of attempted murder, Bruce Sprinkle was sentenced to a term of imprisonment of 7 years and fined $5,000.

■■ ISSUE I. On appeal, Sprinkle first argues that his trial did not comport with due process because the jury was not adequately instructed as to the State's burden of proving that the defendant possessed the requisite mental state to conduct himself in conformance with the law because of intoxication. Section 6—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 6—3) provides that one who is in an intoxicated condition is criminally responsible for his conduct unless the

condition negates the existence of a mental state which is an element of the offense. Both section 3—2 (Ill. Rev. Stat. 1977, ch. 38, par. 3—2) and due process (*Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881) require the prosecution to rebut any properly presented affirmative defense (such as intoxication) with proof beyond a reasonable doubt.

Here, the jury received Illinois Pattern Jury Instructions, Criminal, No. 24.02 (1968) (hereinafter IPI), which provides:

> "An intoxicated person is criminally responsible for his conduct unless his intoxication renders him incapable of acting intentionally."

The jury also received the general instructions specifying the State's burden of proof on the issues of murder, attempt, and aggravated battery. The attempt instruction read as follows:

> "To sustain the charge of attempt, the State must prove the following propositions:
>
> First: That the defendant performed an act which constituted a substantial step toward the commission of the crime of murder; and
>
> Second: That the defendant did so with intent to commit the crime of murder.
>
> If you find from your consideration of all of the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.
>
> If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty." (IPI Criminal No. 6.07.)

However, the jury did not receive IPI Criminal No. 25.02, which delineates the State's burden of proof when there is an affirmative defense. That instruction says:

> "To sustain the charge of—, the State must prove the following propositions:
>
> First: Element of the crime; and
>
> Second: Element of the crime; and
>
> Third: That the defendant was then capable of acting intentionally.
>
> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.
>
> If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved

beyond a reasonable doubt, then you should find the defendant not guilty." IPI Criminal No. 25.02.

Defendant argues that the IPI Criminal No. 24.02 does not in itself sufficiently apprise the jury that the State must disprove the affirmative defense of intoxication beyond a reasonable doubt. But the State counters that defendant failed to tender IPI Criminal No. 25.02 which so informs the jury. Since negation of an affirmative defense is an element of the crime charged, the State claims that the defendant has waived the issue. The State also contends that the jury was adequately instructed concerning the elements of the offense charged, defendant's theory of the case, and the prosecution's burden of proof. Furthermore, it asserts that any error was harmless in view of the overwhelming evidence of defendant's guilt.

In support of his position, defendant cites the case of *People v. Wright* (1975), 32 Ill. App. 3d 736, 336 N.E.2d 18. There, the defendant, who was convicted of murder and of aggravated battery, presented evidence that his conduct was legally justified so that the murder instruction should have included the phrase "without lawful justification." However, the defendant tendered no such instruction, nor was an objection made to the absence of such an instruction. The reviewing court reversed on the basis that the court allowed evidence of defendant's silence when arrested, but—by way of dicta—went on to state that even considering the instructions as a whole, the failure to give IPI Criminal No. 25.05 was error.

In an earlier case by the same name, *People v. Wright* (1974), 24 Ill. App. 3d 536, 321 N.E.2d 52, the defendant was convicted of murder and argued on appeal that certain instructions were erroneously given to the jury. While no objection was made in the trial court, the appellate court applied Supreme Court Rule 451(c) (Ill. Rev. Stat. 1973, ch. 110A, par. 451(c)) and found that there were substantial defects in the instructions which were not waived. The court noted that to avoid the waiver rule, the defendant must show that (1) defects in the instruction were substantial, and (2) those defects resulted in denying defendant a fair trial. The trial court had given instructions which were in direct conflict with each other: One instruction told the jury that the State must prove beyond a reasonable doubt that the defendant was not justified in using force, while another instruction which informed the jury of the issues that must be proven in order to find a defendant guilty contained no instruction that the State must prove the defendant was not justified in using force. Thus, the appellate court found that this was not a case where other instructions in a series may explain an inaccurate instruction and reversed defendant's conviction.

The State cites numerous cases holding that failure to tender instructions, or to object to instructions given, waives any alleged error on appeal. The court in *People v. Tiller* (1978), 61 Ill. App. 3d 785, 378 N.E.2d 282, failed to find substantial defects in the instructions when the trial court did not inform the jury that the prosecution must negate the affirmative defense of self-defense and the defendant failed to tender such instruction. Disagreeing with the *Wright* cases, the court found that the jury had been sufficiently informed of the elements of the offense, the theory of the defense, and the burden of proof when all the instructions were read as a whole.

The instructions in *People v. Bedford* (1976), 38 Ill. App. 3d 1072, 349 N.E.2d 459, did not detail the burden of proof incumbent upon the State nor relate the self-defense issue to the elements of attempted murder. However, defendant's counsel in closing argument discussed the State's burden of proving beyond a reasonable doubt that the defendant was not justified in using the force which he did. Thus, the court found no exception to the normal waiver rule. Likewise, in *People v. Lynch* (1976), 43 Ill. App. 3d 1039, 358 N.E.2d 17, the trial court failed to give an instruction that the State must prove beyond a reasonable doubt that the defendant was not justified in using force. Since no objection was made nor an appropriate instruction tendered, the court found the issue to have been waived. The *Lynch* court specifically noted that it found the *Wright* cases unpersuasive.

Although the defendant failed to tender IPI Criminal No. 25.02 in *People v. Weeks* (1976), 37 Ill. App. 3d 41, 344 N.E.2d 791, he attempted to void the normal waiver rules by citing to Supreme Court Rule 451(c). The reviewing court rejected this argument and found no substantial defect in failing to give IPI Criminal No. 25.02 because the omitted instruction is not a fundamental one which must be given in all cases.

Our supreme court recently discussed the exception to the waiver rule in *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331. There, the court stated that it was not broadly interpreting the provisions of Rule 451(c) and cited to *Henderson v. Kibbe* (1977), 431 U.S. 145, 52 L. Ed. 2d 203, 97 S. Ct. 1730, where that court expressed a reluctance to broadly read exceptions to the waiver rule, particularly in the context of jury instructions. Failure to object to admittedly incorrect attempted murder instructions waived any error on appeal in the *Roberts* case.

■■ In the case at bench, the jury was given the definitional instruction that an intoxicated person is criminally responsible unless that condition renders him incapable of acting intentionally. They were also instructed generally that the State has the burden of proving the defendant guilty beyond a reasonable doubt. Although these two instructions should have

been related in a single instruction, the trial court's failure to *sua sponte* give such an instruction was not so substantial a defect as to avoid the normal waiver rule.

ISSUE II. Sprinkle claims the trial court abused its discretion in admitting photographs depicting the injuries suffered by Kettering because the oral testimony enabled the jury to decide the issue before it and because the sheer number of the allegedly inflammatory photographs was prejudicial. The admission of photographs into evidence is a matter reserved to the sound discretion of the trial judge. (*People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297; *People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208.) Although photographs which serve no purpose other than to inflame and prejudice the jury are inadmissible (*People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121), they are admissible to establish any fact in issue even though they may be of a gruesome nature. *Speck.*

In *Speck*, the court stated that the photographs corroborated the oral testimony of a witness, helped establish the amount of force used by the assailant, and tended to negate an asserted defense. The fact that there is oral testimony concerning the same issues does not necessarily make photographs cumulative as they may corroborate testimony of a witness. *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27; *Speck*; *People v. West* (1977), 54 Ill. App. 3d 903, 370 N.E.2d 265.

In *People v. Stoudt* (1967), 90 Ill. App. 2d 140, 232 N.E.2d 800, it was held that photographs illustrated the testimony of the pathologist as to the nature and extent of the wounds of the deceased and may also have negated the defenses of intoxication and insanity since the nature of the wounds showed a careful, well-coordinated attempt to dismember the body of the victim. And the court in *People v. Holt* (1972), 7 Ill. App. 3d 646, 288 N.E.2d 245, found that a large color photograph which depicted the injuries received by the victim illustrated the use of force which is an essential element in a robbery prosecution. The *Holt* opinion drew no distinction between the use of black and white photographs and colored ones.

Here, it is clear that the photographs served to explain the testimony of the attending physician, Dr. Robert Cox, concerning the location and extent of Kettering's injuries. Dr. Cox felt that the photographs would be a more accurate description of the victim's injuries because of the difficulty of describing each separate wound, word by word. The photographs also corroborated the testimony of Leola Ward and Kettering himself concerning his condition and appearance during and following the attack. Additionally, the photographs were probative of the issue of whether defendant possessed the intent to kill since they depicted

the location of the wounds and the amount of force used. Moreover, the photographs may have been evidence against defendant's intoxication defense by showing an attack on vital areas of the body.

Of the 12 photographs admitted into evidence in this case, the six black and white photographs are bloodless depictions of the location of the wounds. And while the six colored photographs indeed showed blood, they were probative of the force used by the defendant. Furthermore, we do not believe that defendant was prejudiced by photographs showing the wounds from more angles than might have been absolutely necessary. Since all the photographs here were relevant to the issues of intent and intoxication, we hold that the trial judge did not abuse his discretion in admitting them into evidence.

ISSUE III. Sprinkle next asserts that this testimony by Kettering was prejudicial:

> "Q. Now, from your point of observation in that cab, what was the defendant trying to do?
>
> A. Bruce Sprinkle attempted to slit my throat."

Defendant also claims that the testimony of Leola Ward and Dr. Robert Cox invaded the province of the jury when they were allowed to state that while Kettering was being treated for his injuries, he repeatedly stated that "they are trying to kill me."

We have no quarrel with the general rule that a witness' opinion is not admissible into evidence because testimony must be confined to statements of fact of which the witness has personal knowledge. (*People v. Linkogle* (1977), 54 Ill. App. 3d 830, 368 N.E.2d 1075.) In *Linkogle*, the mother of the prosecuting witness in an indecent liberties prosecution was allowed to testify what she thought her young daughter meant by "wriggle his thing." Although the *Linkogle* court noted that in some cases nonexpert opinion evidence is allowed, it held that the mother's opinion in that case was not admissible. Likewise, the supreme court in *Walker v. People* (1890), 133 Ill. 110, 114, 24 N.E. 424, held the trial court properly refused to allow the following question to be asked: "What, if anything, did you think Luther [the deceased] was going to do when he put his hand to his hip pocket?"

■■ ■ There are exceptions, however, to nearly every general rule. And so it is here. Laymen may express opinions on questions of intoxication based on their personal observation and experience. (*People v. Beller* (1977), 45 Ill. App. 3d 816, 360 N.E.2d 130.) It has also been held that improper opinion testimony is not necessarily prejudicial where the conclusion or testimony adduced is an obvious one. (*People v. Sepka* (1977), 51 Ill. App. 3d 244, 367 N.E.2d 138.) Furthermore, a nonexpert can express opinion based on his observations where it is difficult or impossible for him to reproduce for the jury the totality of the conditions perceived and

where the opinion given is one that men in general are accustomed to, and capable of, making, comprehending, and understanding. *People v. Burton* (1972), 6 Ill. App. 3d 879, 286 N.E.2d 792.

A witness may also summarize sensory perceptions. (*United States v. Alexander* (7th Cir. 1969), 415 F.2d 1352.) In *Alexander*, the following testimony was stricken:

> " '* * * * In the upper portion of his body it appeared as if he was removing something—' * * * 'The movement of the upper portion of his body was taking something from under his apron or his shirt.' " (415 F.2d 1352, 1356.)

Without ruling on the trial court's sustaining of defendant's objections, the *Alexander* court characterized the stricken matter as follows:

> "The references to what defendant appeared to be doing were simply an attempt to summarize the witness's sensory impressions as to defendant's head, arm and body movements. There is no general rule excluding such conclusions based on personal observation and common experience as to the physical condition or actions of another." 415 F.2d 1352, 1357.

■■ In the present case, Kettering's statement referred to actions within his immediate observation and sensation. It would seem to us that men in general—although not accustomed to personal experience in throat-slashing—are perfectly capable of comprehending the conclusion that Kettering drew from Sprinkle's actions. In fact, given the photographs and the testimony in the case, the statement that the defendant was trying "to slit" his throat appears obvious. And any error in admitting the testimony of Ward and Dr. Cox concerning Kettering's statements while he was being treated was waived by defendant's failure to object. *Burton.*

ISSUE IV. Finally, defendant argues that a fine of $5,000 is excessive in relation to the statutorily required consideration of defendant's ability to pay the fine. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—9—1(c).) Sprinkle points out that the commentary following section 5—9—1 states that fines are discouraged unless some affirmative reason indicates that a fine is particularly appropriate. The State counters that the fine was within the statutory limits ($10,000 fine could have been imposed (Ill. Rev. Stat. 1977, ch. 38, par. 1005—9—1(a)(1))) and contends that the judge took into account defendant's financial condition.

In the presentence report, Bruce Sprinkle's debts were reported as follows:

> "*DEBTS*: Mr. Sprinkle reported the following debts, however, it may be noted that with the exception of the family, Mr. Sprinkle said his wife had assumed responsibility for bills:
>
> Blessing Hospital—$300-$400
> Broadway National Bank—$500

Thorpe Finance—approximately $1,000
Mr. Glen Sprinkle—$6,000
Mr. Keith Sprinkle—$250
Quincy Clinic—$200."

On the other hand, Sprinkle was paid $5.28 per hour when he was employed prior to incarceration. Although he was unable originally to post $5,000 cash bond, he subsequently did post this amount. The presentence report indicated that the three children from Sprinkle's marriage lived with their mother and it was the presentence report writer's understanding that Sprinkle's wife was to begin divorce proceedings. Furthermore, Kettering did not seek restitution since his insurance paid for his medical bills.

In *People v. Menken* (1977), 54 Ill. App. 3d 199, 369 N.E.2d 363, this court affirmed the imposition of costs, restitution, and a fine of $350 on a burglary conviction where the record indicated that the trial court was aware of the defendant's financial condition and his necessary expenses. Similarly, the court in *People v. Moore* (1976), 41 Ill. App. 3d 3, 353 N.E.2d 191, upheld a fine of $1,000 on a conviction for unlawful delivery of heroin. The court noted that the fine was within the authorized amount and that a minimum period of imprisonment had been imposed.

● 8 In this case the judge considered the presentence report which included statements concerning defendant's financial condition. The fine was within the statutory limits and the sentence of imprisonment was on the lower end of the spectrum. Thus, in our view, the trial court did not abuse its discretion in imposing the fine in addition to the sentence of imprisonment.

In sum, Sprinkle committed a particularly heinous and gory offense, he had his day in court, he had a fair trial, he was found guilty by his peers, and he received a relatively light sentence for such a foul crime. We find no error below.

Affirmed.

TRAPP and GREEN, JJ., concur.