THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD STACK, Defendant-Appellant.

First District (1st Division)   No. 82—1066

Opinion filed November 5, 1984.

CAMPBELL, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Marilyn Martin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Paula Carstensen, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Richard Stack was convicted of the murders of his wife and 13-month-old son. He was sentenced to two concurrent terms of natural life.

On appeal, the issues raised by defendant include: (1) whether the trial court erred in refusing to ask certain *voir dire* questions designed to ascertain the prospective jurors' attitudes towards the insanity defense; (2) whether the admission of evidence and prosecutorial argument regarding defendant's silence following his *Miranda* warnings constituted reversible error; (3) whether it was reversible error to allow an expert witness to interpret another witness' testimony; (4) whether defendant was denied a fair trial due to the prosecutor's alleged misstatements regarding the consequences of an acquittal; and (5) whether defendant was proved sane beyond a reasonable doubt. We reverse and remand for a new trial.

The record discloses that on May 11, 1980, defendant murdered his wife by repeatedly kicking her in the head, stabbing her with a pool cue and then slashing and mutilating her body. After murdering his wife, defendant threw his 13-month-old son against a wall, fracturing the infant's skull. Defendant then repeatedly stabbed the baby with the same pool cue he used in murdering his wife.

Dr. Robert Stein, the Cook County medical examiner, testified that he performed autopsies on the bodies of Carol Ann Stack and Richard Stack, Jr. Dr. Stein found nearly 100 stab and slash wounds on the body of Carol Ann. He also found segments of wood, identical to a pool cue, along with other foreign objects within the pleural cavity of her body. Dr. Stein's examination of the infant's body revealed a depressed skull fracture in addition to numerous puncture wounds, contusions and lacerations of the head and chest areas.

Chicago police officers William Christopher and Thomas Scott testified that when they arrived at defendant's residence on May 11, 1980, they saw defendant leaning out of a broken window screaming

and yelling. Officer Scott testified that defendant was yelling about devils and demons. Both officers said that defendant called out to them, "I have been looking for you. I just killed my wife and baby." At Officer Scott's instruction, defendant opened the front door and was handcuffed on the front porch without resistance. Officer Scott testified that defendant was given his *Miranda* rights and that defendant indicated he understood each right. Defendant was then transported to Holy Cross Hospital for treatment of superficial cuts to his hands and face.

Detective William Foley testified that he spoke with defendant in the emergency room of Holy Cross Hospital. Detective Foley advised defendant of his *Miranda* rights and then asked defendant why he was at the hospital. Defendant responded that he was being treated for hand injuries. In response to other questions, defendant stated that he had attended mass twice that day and that following the second mass he began fighting the demons which were coming from his wife and child. Defendant explained that the demons came from his wife because she had not gone to confession. Defendant further stated that there was evil in the world and he was trying to drive the demons out. When asked how he committed the murders, defendant stated that he did not want to say anything about the method he used because the answer was in the Bible. Foley testified that during the interview defendant appeared to be in contact with reality. Foley said that defendant's treating physician, Dr. Jane Caseley, wanted commitment papers signed and that several doctors and nurses were talking about transporting defendant to a psychiatric facility. Foley, however, disagreed, and defendant was taken to a lockup after being released from the hospital.

Mary Bolster, Carol Ann's mother, testified that she saw defendant on May 10, 1980, the night before the murders, and did not notice anything unusual about defendant's behavior that evening. Bolster also said that when she called Carol Ann the afternoon of the murders, defendant answered the telephone and "they conducted a very usual conversation."

Among those testifying for the defense was Dr. Jane Caseley, an emergency room physician at Holy Cross Hospital who treated defendant for cuts to his hands on May 11, 1980. Dr. Caseley stated that the police requested that defendant not be sedated and, thus, no anesthetic was used during the suturing procedure. Caseley recalled that defendant winced once during the suturing but his hands remained still during the remaining procedure. Defendant told Dr. Caseley that his left hand belonged to someone else. Dr. Caseley further

stated that defendant was cooperative in answering questions, but when asked about his medical history he responded that Dr. Caseley and the nurses should ask the Pope. Dr. Caseley also stated that defendant spoke in a low coarse voice of demons. In Dr. Caseley's opinion, defendant was in need of psychiatric care, "so she signed commitment papers." At Officer Foley's request, however, defendant was instead taken to a lockup.

Various relatives and friends of defendant also testified and recounted occasions on which defendant acted unusually. Additionally, Father Robert Lutz, a Chicago priest, described a visit from defendant in which defendant discussed the evil in the world. Following the visit, Father Lutz suggested to defendant's brother-in-law, John Principato, that defendant seek professional help.

Father Joseph Bennett, Cook County jail chaplain, testified that a few days after the offense Father Lutz requested that he visit defendant. Father Bennett stated that defendant told him that he had special powers and was commanded by God to kill his wife and child. Defendant also said that he had used his hands to kill the child and used a perfume bottle to kill his wife. In Father Bennett's opinion, defendant was not in contact with reality.

Dr. Albert Stipes, a psychiatrist employed by the Cook County Court Psychiatric Institute, testified that he examined defendant on June 11, 1980. Stipes stated that defendant exhibited a well-organized system of active delusions concerning special powers such as reading backwards and the belief that he was being persecuted by non-Catholics. Defendant described a visual hallucination that he had, prior to committing the murders, of an old man turning into a child. Dr. Stipes testified that in evaluating defendant, he considered a report made by Dr. Garbin in which defendant stated that he had fought with his wife for three hours and had finally killed the demon within her. The report also included the following quote from defendant: "My baby handed me rosary beads in alcohol and I shoved it in her. The baby then changed, too, and came at me and I killed that demon too, beating it."

Dr. Robert Reifman, director of the Cook County Circuit Court Psychiatric Institute, examined defendant on December 18, 1981, and February 18, 1982. Dr. Reifman also reviewed defendant's medical records and the police report during this period. During the 1981 interview, Dr. Reifman observed that defendant exhibited extremely disoriented thought, agitation, confusion and hyperactivity symptoms attributable to, in Dr. Reifman's opinion, an inappropriate change in antipsychotic medication in the jail. During the examination, defend-

ant told Dr. Reifman that defendant's baby looked like the baby Jesus, which was a sign that defendant's wife was possessed by demons. According to Dr. Reifman, defendant committed what defendant believed to be an altruistic act which was necessary to save the world from demons and devils.

Drs. Stipes and Reifman agreed that defendant suffered from paranoid schizophrenia, experienced a major break with reality and lacked both the substantial capacity to appreciate the criminality of his conduct and the ability to conform his conduct to the requirements of law on the date of the murders. The doctors also agreed that defendant was not lying, feigning illness or malingering.

During the State's rebuttal, Patricia Greco testified that she had known defendant and Carol Ann since grade school. Greco testified as to arguments that defendant had with Carol Ann on four separate occasions in 1976, 1977, and 1979. During the 1977 argument, defendant bit off and swallowed the diamond from Carol Ann's engagement ring.

Diane Bolster, Carol Ann's sister, testified that on the day prior to the murders, defendant and Carol Ann visited her, and during the 45-minute conversation defendant never mentioned religion, demons or devils. On the morning of the murders, Bolster visited defendant and Carol Ann and, after offering to watch the baby for Carol Ann, defendant jumped up and said, "No, the baby stays here." Defendant then walked out of the house with the baby, saying, "Leave me alone, I will do what I want."

Dr. Werner Tuteur, a psychiatrist and chief consultant to the Elgin Mental Health Center, testified on rebuttal that he examined defendant on September 19, 1981, October 6, 1981, and February 17, 1982, and reviewed reports on defendant from the Chester Mental Health Center, the Cook County Circuit Court Psychiatric Institute, and the police. During the interviews defendant said that he had seen the devil come out of his wife's body and that it had laid hands on her. Defendant told Dr. Tuteur that he had one experience with demons the day after the murders but had seen devils and demons before the murders during hangovers. Dr. Tuteur found no evidence of mental disease during the interviews which, in his opinion, indicated that a mental disease never existed. Dr. Tuteur testified that defendant's belief about dying for people's sins were delusions and hallucinations caused by alcohol. Dr. Tuteur disagreed with the diagnoses of defendant as being a paranoid schizophrenic and believed that defendant could have conformed his conduct to the requirements of the law. According to Dr. Tuteur, defendant's conduct of screaming to police

officers that he had just killed his wife and child indicated that defendant knew the criminality of his actions.

## I

We first address defendant's contention that the trial court erred in refusing to question prospective jurors on the *voir dire* examination with regard to any bias or prejudice the jurors might have against the insanity defense. Prior to trial, defense counsel submitted the following questions for the trial judge to ask on *voir dire*:

"1. Have you or anyone close to you had any experience with a psychiatrist or psychologist?

2. Do you agree with the concept that a person should not be held responsible for his acts if he is not capable of conforming his conduct to the requirements of the law?

3. Can you find someone not guilty by reason of insanity?

4. Do you have any feeling or viewpoint concerning the defense of insanity in a criminal case? If so, what?"

The trial judge agreed to ask the first question, but refused the other three, stating that he would instead ask the prospective jurors if they could follow the law.

The purpose of *voir dire* examination is to permit counsel to ascertain whether the minds of prospective jurors are free from bias or prejudice. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.) Where insanity is in issue, the parties have a right to examine jurors concerning their attitude on the insanity defense. (*People v. Robinson* (1981), 102 Ill. App. 3d 884, 429 N.E.2d 1356; *People v. Moore* (1972), 6 Ill. App. 3d 568, 286 N.E.2d 6.) The manner and scope of *voir dire* examination lies within the discretion of the trial court. *People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066.

■ In the case at bar, we believe that the trial court abused its discretion concerning the *voir dire* examination. Although the questions tendered by the defense in this case were designed to probe and discover any potential bias or prejudice regarding the insanity defense, the only question asked pertained to personal experiences with a psychiatrist or psychologist. This question was insufficient to elicit a response concerning the insanity defense. Further, the general questions of whether the jurors could follow the law and whether they could be fair and impartial were also insufficient to cure the error. Such broad inquiries failed to call attention to specific matters which might lead the jurors to display disqualifying attitudes and preoccupations. (*United States v. Lewin* (7th Cir. 1972), 467 F.2d 1132, 1138.) The trial court therefore erred in refusing to ask the above questions

tendered by the defense.

The State argues that any error as to the *voir dire* was harmless, and cites *People v. Pitts* (1982), 104 Ill. App. 3d 451, 432 N.E.2d 1062. In *Pitts*, it was held that no reversible error resulted from the trial court's refusal to examine jurors concerning their attitudes on the insanity defense because there was overwhelming evidence of defendant's sanity. The court in *Pitts* concluded that the finding of defendant's guilt would not have changed even if the suggested questions had been put to prospective jurors. (104 Ill. App. 3d 451, 457.) This same conclusion cannot be reached in the case before us. Here, both Drs. Stipes and Reifman testified that they examined defendant and agreed that he suffered from paranoid schizophrenia, and lacked both the substantial capacity to appreciate the criminality of his conduct and the ability to conform his conduct to the requirements of the law at the time of the murders. Both doctors further agreed that defendant was not lying or feigning illness. Additionally, the defense evidence received corroboration from the State's lay witnesses; for instance, both arresting officers told Detective Foley that defendant had been screaming about God, devils and demons before he was taken into custody.

Hence, unlike *Pitts*, we cannot with certainty conclude in this case that the verdict would not have changed even if the tendered questions had been asked on *voir dire*. Although we believe that, given the evidence in this case, the error as to this matter was sufficient alone to require the reversal and remand of this cause, our determination is supported by other trial errors discussed below.

## II

■ We turn next to defendant's argument that it was error to admit evidence and prosecutorial argument concerning his invocation of the right to remain silent. Defendant objects to the admission of testimony elicited from Detective Foley, during the State's rebuttal, that defendant told Assistant State's Attorney Bredeman that he chose not to say anything after being advised of his *Miranda* rights. Defendant also objects to the cross-examination of Dr. Reifman with respect to the psychiatric significance of defendant's invocation of his right to remain silent. Finally, defendant objects to the prosecutor's comment in closing argument that defendant "all of a sudden" exercised his right to remain silent when Dr. Caseley wanted to commit defendant but Detective Foley wanted to retain custody of defendant.

Defendant alleges that the admission of such evidence and argument constituted an intolerable penalty on his exercise of his fifth

amendment right against self-incrimination. We agree. Because comment on the exercise of the fifth amendment privilege against self-incrimination diminishes the privilege by making its assertion costly, both due process and the fifth amendment forbid evidentiary use of a defendant's claim of that privilege in the wake of *Miranda* warnings. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.) Such comment is permissible only for the limited purpose of impeaching a defendant who actually makes post-arrest statements contradicting his trial testimony or who falsely testifies to an exculpatory post-arrest statement. (*People v. Foster* (1980), 81 Ill. App. 3d 915, 926, 401 N.E.2d 1221.) Neither exception applied in the present case.

In the analogous case of *People v. Vanda* (1982), 111 Ill. App. 3d 551, 444 N.E.2d 609, this court held that the admission of the defendant's post-arrest request for counsel as evidence of the defendant's sanity was error. Our court found very little relevance in the evidence with respect to the defendant's mental state and refused to carve out a special circumstance allowing a penalty on the defendant's exercise of a constitutional right simply because sanity is placed in issue. Such a holding would force the defendant to an intolerable choice between foregoing his constitutional right or bearing the prejudice of having his assertion of the right introduced against him at trial. *People v. Vanda* (1982), 111 Ill. App. 3d 551, 563; see also *Greenfield v. Wainwright* (11th Cir. 1984), 741 F.2d 329.

The foregoing holds true in the instant case. We note the jury was not cautioned to consider the evidence for a limited purpose. Indeed, the trial court repeatedly overruled defense objections, thereby judicially validating the jury's consideration of the evidence for any substantive purpose. The evidence was not isolated; it was used to cross-examine defendant's expert witness and during the State's rebuttal. In closing argument, the prosecutor emphasized the significance of the evidence:

> "At 5:15, the Assistant State's Attorney comes in. You heard from Foley, you saw the memorandum that Dr. Reifman read. And the State's Attorney says to him—explains him his rights. And what does the defendant say? He says, do I have to answer questions? And the State's Attorney tells him no, you have that right not to. And he says, that's what I want. And the conversation is really important when you consider what was happening at that time. When Dr. Caseley wanted to send him away and Detective Foley wanted to retain responsibility for that man, which was his job, all of a sudden, ladies and gen-

tlemen, while that is going on, the defendant exercises his right to remain silent. One of the most important rights anybody in custody could have. And now you want to tell us that he didn't understand where he was, that he was out of touch with reality on that date?"

The evidence thus improperly served to promote the State's theory that defendant was "feigning" schizophrenia. Given the foregoing facts and circumstances, it is clear that the error as to this matter severely prejudiced defendant.

### III

■ We next consider defendant's contention that it was error for the State's expert, Dr. Tuteur, to comment upon the testimony of another witness, Peter Bukiri. Bukiri had testified that he and defendant had planned to take their two children somewhere on the date of the offense. During the prosecutor's direct examination of Dr. Tuteur, the following exchange occurred:

"Q. Doctor, had I informed you of the testimony of a man known as Peter Bukiri in this case, a man who had set out in his testimony he was going to meet the defendant on Mother's Day afternoon with the defendant and his child and he and his child?

A. Yes, it [sic] did.

Q. Did that indicate anything to you, Doctor?

A. Yes, as far as I understand, he was supposed to take his little boy to meet this man with his little boy, but his wife didn't like that.

MR. KULL: Objection.

THE COURT: That is what he said? I don't know that you can go into that.

MR. KULL: How does he know that?

THE COURT: I don't know."

Defendant argues that it was for the jury, rather than Dr. Tuteur, to draw whatever inferences existed in Bukiri's testimony. Defendant further asserts that Dr. Tuteur's testimony bolstered the State's motive evidence concerning defendant's marital disputes and was therefore prejudicial. We are in agreement with defendant. The admission of the testimony in question improperly invaded the province of the jury and was error. See *People v. Linkogle* (1977), 54 Ill. App. 3d 830, 368 N.E.2d 1075; *People v. Cunningham* (1966), 73 Ill. App. 2d 357, 218 N.E.2d 827.

## IV

██ Defendant also objects to several comments made by the prosecutor during final argument. The prosecutor repeatedly stated that society would "have to live with" defendant if the jury allowed him to escape responsibility. Defendant maintains that the remarks misled the jury into believing that if he was acquitted for reasons of insanity, he immediately would be returned to society. He contends, therefore, that the remarks were a misstatement of the law and were thus prejudicial.

We find that the remarks complained of were error. Similar comments have been held to be improper. (*People v. Wilson* (1983), 120 Ill. App. 3d 950, 960, 458 N.E.2d 1081.) We note that no curative instruction was given; an instruction tendered by defendant clarifying the correct post-verdict consequences of an acquittal was denied by the court.

## V

██ Finally, defendant argues that the State failed to rebut beyond a reasonable doubt the evidence that he was legally insane at the time of the murders. After reviewing the record, we believe that whether or not defendant in this case was legally insane presented a question of fact to be resolved by the jury, following a fair and impartial trial.

For the foregoing reasons, we reverse defendant's conviction and remand this cause for a new trial. Given our disposition, we find it unnecessary to address defendant's remaining allegations.

Reversed and remanded.

McGLOON, J., concurs.

JUSTICE CAMPBELL, dissenting:

## I

The majority has concluded that the trial court abused its discretion concerning the *voir dire* examination, holding that the trial court erred in refusing to ask the three questions tendered by the defendant. The second question involved a question of law (*People v. Phillips* (1981), 99 Ill. App. 3d 362, 425 N.E.2d 1040), and the third question was argumentative and properly refused. The fourth question was also properly refused, and the court was correct in telling the jury that the case involved the insanity defense and asking the jurors

whether they could give both sides a fair trial. The manner and scope of *voir dire* examination lies within the sound discretion of the trial court. (*People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066.) I am not convinced that the court erred in refusing to propound the three questions tendered by the defendant in light of the overwhelming evidence of the defendant's guilt. See *People v. Pitts* (1982), 104 Ill. App. 3d 451, 432 N.E.2d 1062.

## II

The majority has also concluded that the admission of evidence and arguments relating to the defendant's invocation of his right to remain silent constitutes an intolerable penalty on defendant's exercise of his fifth amendment right against self-incrimination. The State asserts that the prosecutor made the remark that defendant "all of a sudden" exercised his right to remain silent to support the State's contention that defendant was coherent and aware of his rights immediately following the murders. The State further asserts that defendant did not remain silent following his arrest, but instead gave statements and acted in a manner which was inconsistent with defendant's claim of insanity. The State cites defendant's actions at the time of his arrest, his confession to Detective Foley following the murders, and his extensive statements to defense psychiatrists. Defendant did not remain silent and was in touch with reality, and as such, the prosecutor did not improperly comment on defendant's right to remain silent. The State argues alternatively that, even if defendant did assert his right to remain silent, that evidence was highly probative of defendant's mental state and was needed to rebut evidence of defendant's insanity following the murders. I agree with the State's position, and any error in admitting the evidence was harmless error beyond a reasonable doubt. The cases cited by the majority stand for general propositions of law and are of little help here. See *Sulie v. Duckworth* (7th Cir. 1982), 689 F.2d 128; *People v. Spicer* (1979), 79 Ill. 2d 173, 402 N.E.2d 169; *People v. Vanda* (1982), 111 Ill. App. 3d 551, 444 N.E.2d 609.

## III

The majority holds that it was error for the State's expert, Dr. Tuteur, to comment upon the testimony of another witness, Peter Bukiri, a friend of defendant's, who testified regarding the defendant's conduct on the day before the murders. Following Dr. Tuteur's response, defense counsel objected and the trial judge questioned how Dr. Tuteur could give such an opinion. Defendant argues that it was

for the jury, not for Dr. Tuteur, to draw whatever inferences existed in Bukiri's testimony. Defendant further argues that Dr. Tuteur's testimony bolstered the State's motive evidence concerning the defendant's marital disputes and was therefore prejudicial. The State, however, argues that the opinion testimony drew an obvious inference from the evidence adduced at trial and therefore was not prejudicial. (*People v. Sprinkle* (1979), 74 Ill. App. 3d 456, 393 N.E.2d 94.) After a review of the record, I find the error, if any, to be harmless in view of the overwhelming evidence of defendant's sanity at the time of the murders. *Cf. People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.

## IV

Defendant also objects to several comments made by the prosecutor during the final argument. The defendant claims that the remarks misled the jury into believing that if defendant was acquitted for reasons of insanity, he would be immediately returned to society. Defendant therefore maintains that the remarks were a misstatement of the law and thereby prejudicial.

In *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203, the Supreme Court did not find that similar comments were reversible error, and *People v. Wilson* (1983), 120 Ill. App. 3d 950, 458 N.E.2d 1081, does not support the conclusion of the majority in the case at bar. In my view, *People v. Wilson* does not stand for the proposition that the comments of the prosecutor, standing alone, constitute reversible error. Under the facts of *People v. Wilson,* when a close question was presented on the key issue of the defendant's sanity at the time of the occurrence, other factors peculiar to that case (denial of request for continuances and in quashing subpoenas) prompted the court in granting a new trial.

## V

Finally, the evidence presented in this case was not closely balanced, and the errors complained of were not of such a magnitude that the defendant was denied a fair and impartial trial. The record and the evidence presented support the finding of guilty, as the State has met its burden in this case. I do not agree with the majority that the errors complained of constitute reversible error, and I would affirm the conviction.