**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 170603-U

Order filed January 17, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | Appeal No. 3-17-0603 |
| v. | ) | Circuit No. 02-CF-959 |
| | ) | |
| THEODORE BAILEY, | ) | |
| | ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justice Carter concurred in the judgment.
Presiding Justice Lytton, dissented.

**ORDER**

¶ 1    *Held*:   The court did not err in denying defendant's postconviction petition.

¶ 2    Defendant, Theodore Bailey, appeals the Peoria County circuit court's third-stage denial of his postconviction petition, arguing that he was denied effective assistance of appellate counsel where counsel failed to challenge the State's impermissible use of his postarrest silence. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4         In 2002, the State charged defendant by indictment with four counts of home invasion (720 ILCS 5/12-11(a)(4), (a)(5) (West 2002)), three counts of aggravated battery with a firearm (*id.* § 12-4.2(a)(1)), and one count of armed robbery (*id.* § 18-2(a)). The case proceeded to a jury trial in 2004.

¶ 5         The evidence at trial established that in the early morning hours of September 29, 2002, Marvin Carter, Sammy Goins, Katherine DeJaynes, Charlotte Stone, and another woman were at Carter's apartment. At approximately 4:30 a.m., they heard a knock on the door and a man said, "Police, open up." Carter opened the door and two men were standing there. Both men were wearing hooded sweatshirts. One man was holding a black gun. The other man wore a bandana over his face and a pair of gloves and held a nine-millimeter handgun. The men entered the apartment without Carter's permission. The man with the black gunshot Carter in the hip, DeJaynes in the back thigh, and Goins twice, once in the chest and once in the face. The man with the bandana searched the apartment for valuables, taking knives and a watch. One of the men had a police scanner.

¶ 6         Officers Amanda Chalus, Mark Lamb, and Craig Williams reported to a call of shots fired. Lamb stated that he approached the residence on foot and heard gunshots. The officers observed two subjects run from behind the residence. Lamb and Williams followed them on foot. The two subjects split up, one running northbound and the other running southbound through a yard. Lamb and Williams followed the man that went southbound. As soon as they ran into the yard, about 5 or 10 seconds after they initially saw the men, they found defendant lying on the ground next to a tree. Lamb testified that as soon as he came upon defendant he "ordered him to place his hands behind his back and *** took him into custody ***. *** [W]e didn't question him or anything like that." Lamb stated, "At the time I came upon [defendant], my sole consideration was placing him

into custody, making sure he had no weapons, getting him secured and that." Defendant had blood on his jeans, but, after testing, it was determined that the blood was defendant's and did not match any of the victims. Chalus ran to the front of the residence where a victim was screaming. Chalus found a nine-millimeter handgun in the driveway behind the residence, approximately 150 to 200 feet from where Lamb apprehended defendant.

¶ 7        On defendant's person, Lamb found, *inter alia*, a police scanner, a knife, and a watch. Lamb discovered a bandana and gloves on the ground next to defendant. Defendant was wearing a hooded sweatshirt. In court, Carter identified the watch and knife as two of the objects taken from his residence. Goins identified the gloves and police scanner as those used by the perpetrator. Both men recognized the bandana as the one worn by the perpetrator.

¶ 8        Matthew Burnside pled guilty to his involvement in the incident. He testified that defendant drove him to the residence that night, but that he and Carl Nelms were the two men that entered the residence. Burnside shot Carter and Nelms shot Goins. Defendant was supposed to wait in the car. However, when Burnside ran out of the house, he bumped into defendant. Burnside dropped his police scanner, gloves, knives, and handkerchief. He told defendant to pick up the stuff while Burnside ran off. Burnside testified that defendant did not have a handgun or a police scanner that night. However, Burnside had previously given a videotaped statement in which he implicated defendant. In the statement, Burnside said that he and defendant entered the residence that night. Defendant was wearing a bandana over his face and perpetrated the shooting, while Burnside looked for valuables. Burnside had never previously mentioned Nelms. He stated that he lied in his statement because he heard rumors that defendant was involved in his girlfriend's death. He testified that he decided to tell the truth on the stand because he had found God.

¶ 9    Defendant testified that he had driven Burnside around that day. They went to Carter's residence, and Burnside told defendant to stay in the car. When defendant heard a gunshot, he exited the car and started toward the residence. He saw several people running from the residence and heard more shots. He then bumped into Burnside, who dropped some items. Defendant apologized for bumping into Burnside and picked up the items, including a police scanner, gloves, a bandana, a knife, and a watch. Burnside ran away. Defendant then noticed people with flashlights coming toward him so he ran. When he realized the approaching people were police officers, he turned into a lot and lay down by a tree. When the officers found him, he said, "I ain't did nothing, man, I ain't did nothing. *** I didn't do nothing." He was then taken into custody. On cross-examination, the State asked defendant if he told the officers that Burnside had dropped the items and ran off. Defendant said he did not and that they never asked him.

¶ 10    During closing arguments, the State said,

"Ladies and gentlemen, a truly innocent person does not take the stand and talk about events leading up to it for an hour. They take the stand, immediately, I didn't do this, I didn't do this. They don't talk about their uncle and their cousin and they went to see this and did this, they cut down trees and mowed someone's yard and did this. Ladies and gentlemen, that doesn't happen. Somebody who's guilty does that; someone[ ] who's guilty dodges the bullet."

In rebuttable, the State said, *inter alia*,

"Defendant's denial from the start. No evidence of confession. Ladies and gentlemen, you heard me cross-examine the Defendant yesterday. And I asked him when he spoke with the detective, Ledbetter, and I'm not going

to go through the litany because I can't remember every question I asked, but it was basically, Did you tell him you bumped into Burnside and you had nothing to do with this, and you had been driving Burnside, blah, blah, blah, blah, blah? No. Ladies and gentlemen, ask yourselves is it reasonable to think that someone who has nothing to do with this, no idea anything is going on, absolutely nothing, is it reasonable to think that the first time he speaks with the detective he wouldn't tell him exactly that? Ladies and gentlemen, wouldn't you say, Hey, I didn't do any of this; I was just there; I was just driving; I bumped into Burnside and picked them up, that's why I had the stuff; I didn't do this? He said, I didn't do this, but he didn't say anything else about where the stuff came from. Ladies and gentlemen, you know, you're caught at the scene with proceeds from the robbery, a gun, following the same path that you did, why wouldn't you say, I bumped Matthew Burnside, if that's really what happened?"

¶ 11 The jury found defendant guilty of all counts of home invasion. On one count, the jury found that defendant personally discharged a firearm which caused great bodily harm to Goins. However, on the other three counts the jury did not find that defendant personally discharged a firearm when threatening to shoot Goins, Carter, and DeJaynes. The jury also found defendant guilty of armed robbery. The jury could not reach a verdict on the count that alleged that defendant committed aggravated battery with a firearm by shooting Goins. Thus, the court declared a mistrial on that count. Moreover, the jury found defendant not guilty on two counts of aggravated battery with a firearm against Carter and DeJaynes, and the court entered judgments of acquittal.

Defendant was sentenced to 61 years' imprisonment for home invasion and a consecutive 18-year term of imprisonment for armed robbery.

¶ 12    On direct appeal, defendant argued: (1) the jury returned inconsistent verdicts on home invasion, (2) the court erroneously instructed that the jury could find defendant guilty of home invasion based on a theory of accountability, and (3) he received ineffective assistance of posttrial counsel. This court affirmed defendant's convictions. *People v. Bailey*, No. 3-05-0383 (unpublished order under Illinois Supreme Court Rule 23).

¶ 13    In 2007, defendant filed a *pro se* postconviction petition, which is the subject of this appeal. Defendant was appointed counsel and the matter was set for second-stage proceedings. Counsel filed an amended petition, arguing, *inter alia*: (1) the State violated defendant's constitutional rights when it improperly questioned him regarding his postarrest silence and argued in closing that defendant failed to tell the officers his story, (2) trial counsel was ineffective for failing to object to the State's use of his postarrest silence, and (3) appellate counsel was ineffective for failing to raise the postarrest silence issue. The State filed a motion to dismiss. The court granted the State's motion as to defendant's first two contentions but permitted the other claim to advance to the third stage.

¶ 14    After a third-stage hearing, the court issued a written decision denying defendant's postconviction petition. In doing so, it found that trial counsel accurately conveyed the sentencing range and any plea offers. The court stated,

> "Even if a *Doyle v. Ohio* analysis was made, this case is distinguishable for
> the reason that the Defendant here made statements to the police early on
> which could then be subject to cross exam at trial and for fair comment by
> the prosecutor in closing argument.

*** Moreover, the evidence in the case was not so closely balanced so that even if error were made by appellate counsel in failing to raise the aforementioned 'post arrest silence issue', it would not have likely changed the outcome; *i.e.*, Defendant cannot establish he was prejudiced by such."

¶ 15                                    II. ANALYSIS

¶ 16        On appeal, defendant contends that the court erred in denying his postconviction petition at the third stage. Specifically, defendant contends that appellate counsel was ineffective for failing to challenge the State's impermissible use of his postarrest silence. Because the State questioned defendant about his prearrest statement, not his postarrest silence, appellate counsel was not deficient. Moreover, the State's questioning did not prejudice defendant because the evidence was not closely balanced.

¶ 17        The Post-Conviction Hearing Act (Act) allows a person to assert that his conviction and sentence were the product of a substantial denial of his constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2006). A claim of ineffective assistance of counsel is cognizable under the Act. See *People v. Bell*, 209 Ill. App. 3d 438, 443 (1991). In order to succeed on a claim of ineffective assistance of counsel, defendant must show (1) counsel's performance was deficient and (2) prejudice resulted from the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We will consider each prong in turn.

¶ 18                              A. Deficient Performance

¶ 19        Defendant argues that appellate counsel's performance was deficient where he failed to challenge the State's use of his postarrest silence.

"[T]he United States Supreme Court held in *Doyle v. Ohio*, 426 U.S. 610, 617-20 (1976), that it was a violation of the due process clause of the

fourteenth amendment for the State to impeach a defendant using evidence that defendant was silent following his arrest, after he was advised of his *Miranda* rights. The Court reasoned that since the *Miranda* warnings carry the implicit assurance that his silence will carry no penalty, it would be fundamentally unfair to allow a defendant's post-*Miranda* silence to impeach his trial testimony. *Doyle*, 426 U.S. at 612, 618. However, the Supreme Court later held that the prohibition applies only to a defendant's silence after being advised of his *Miranda* rights. *Fletcher v. Weir*, 455 U.S. 603, 607 (1982) (*per curiam*). In doing so, it found that states were free to formulate their own rules with respect to defendant's silence before arrest (*Jenkins v. Anderson*, 447 U.S. 231, 238 (1980)), as well as after arrest but before receiving *Miranda* warnings (*Fletcher*, 455 U.S. at 607)." *People v. Quinonez*, 2011 IL App (1st) 092333, ¶ 25.

"Illinois evidence law prohibits impeachment of a criminal 'defendant with his or her postarrest silence, regardless of whether the silence occurred before or after the defendant was given *Miranda* warnings.' " *Id.* ¶ 26 (quoting *People v. Clark*, 335 Ill. App. 3d 758, 762-63 (2002)). Our supreme court has held that "an accused is within his rights when he refuses to make a statement, and the fact that he exercised such right has no tendency to prove or disprove the charge against him, thus making evidence of his refusal neither material or relevant to the issue being tried." *People v. Lewerenz*, 24 Ill. 2d 295, 299 (1962) (citing *People v. Rothe*, 358 Ill. 52, 57 (1934)). "Thus, the Illinois evidentiary rule generally prohibits impeachment of a criminal defendant with his postarrest silence, regardless of whether it occurred before or after he was given *Miranda* warnings, because under those circumstances, that silence is not considered relevant or material."

*Quinonez*, 2011 IL App (1st) 092333, ¶ 27. However, silence prior to arrest may properly be used by the State to impeach trial testimony. See *People v. Graves*, 142 Ill. App. 3d 885, 889-90 (1986).

¶ 20    Here, defendant testified at trial that, when he was approached by the officers, he said to them, "I ain't did nothing, man, I ain't did nothing. *** I didn't do nothing." Based on this, the court at the third-stage hearing stated, "if a *Doyle v. Ohio* analysis was made, this case is distinguishable for the reason that the Defendant here made statements to the police early on which could then be subject to cross exam at trial and for fair comment by the prosecutor in closing argument." We agree. The above cited law prohibits the State's use of postarrest silence, while allowing the use of prearrest silence. Notably, the law does not prohibit the State's use of a *statement* made by defendant either before or after arrest. By asking defendant on cross-examination whether he told the officers that he ran into Burnside and commenting on such omission during closing arguments, the State was questioning defendant about the breadth of his prearrest statement. See *Anderson v. Charles*, 447 U.S. 404, 408 (1980) ("*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks *** has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all."). Moreover, a prosecutor's statements based on the facts in evidence or upon reasonable inference from the evidence are within the scope of proper closing argument. *People v. Myers*, 246 Ill. App. 3d 542, 547 (1993). Because the State was within its right to cross-examine defendant about omissions in his statement to the police and to use such during closing arguments, appellate counsel was not deficient for failing to raise the issue on appeal.

¶ 21                                          B. Prejudice

¶ 22    Even if we were to find that appellate counsel's performance was deficient, we would not find that such deficient performance prejudiced defendant. *Strickland*, 466 U.S. at 687. The defendant must prove that "there is a reasonable probability that, but for appellate counsel's errors, the appeal would have been successful." *People v. Golden*, 229 Ill. 2d 277, 283 (2008). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 23    We do not believe that there is a reasonable probability that, had counsel raised this issue on defendant's direct appeal, the appeal would have been successful. Defendant's trial counsel did not preserve the issue, therefore, appellate counsel would have had to argue the issue under plain error, including arguing whether the evidence was closely balanced. See *People v. Naylor*, 229 Ill. 2d 584, 605-06 (2008). The evidence at trial was overwhelming. Carter and Goins testified that two men wearing hooded sweatshirts knocked on the door. One of the men was wearing a bandana over his face and was holding a nine-millimeter handgun. One of the men had a police scanner. Carter stated that the items the men took included a knife and a watch. Goins stated that the man wearing the bandana was also wearing gloves.

¶ 24    Lamb testified that he received a call of shots fired and reported to the residence. As he was approaching on foot, he heard gunshots. He then saw two men run from the residence and gave chase. The two subjects split up, and Lamb continued to pursue one traveling southbound. He followed the man into a yard. As soon as he ran into the yard, he found defendant lying on the ground. Defendant was wearing a hooded sweatshirt. On the ground next to defendant, Lamb found a bandana and gloves. On defendant's person, Lamb discovered, *inter alia*, a knife, a watch, and a police scanner. Chalus found a nine-millimeter handgun approximately 150 to 200 feet from where defendant was discovered. In court, Carter and Goins identified the bandana Lamb found as the

one worn by the perpetrator. Carter identified the watch and knife as two of the objects taken from his residence. Goins identified the police scanner and gloves Lamb discovered as those used by the perpetrator. Moreover, defendant fled from the police. "Generally, flight is a circumstance that can be considered as bearing upon guilt [citations], as evidence of a consciousness of guilt or circumstantial evidence that tends to show a defendant's guilt." *In re M.L.*, 232 Ill. App. 3d 305, 308 (1992). In a videotaped statement, Burnside implicated defendant. While defendant provided another account and Burnside recanted and backed defendant's account, the evidence was still overwhelming. Considering the overwhelming evidence against defendant, we cannot say that the evidence was closely balanced. Therefore, defendant's appeal would not have been successful.

¶ 25                                    III. CONCLUSION

¶ 26        For the foregoing reasons, we affirm the judgment of the circuit court of Peoria county.

¶ 27        Affirmed.

¶ 28        PRESIDING JUSTICE LYTTON, dissenting:

¶ 29        I respectfully dissent from the majority's decision in the present case. I would find that the State improperly questioned defendant about his postarrest silence, and defendant was prejudiced by such questioning. Thus, I would find that appellate counsel was ineffective for failing to raise the issue of the State's improper use of defendant's postarrest silence.

¶ 30        While the majority finds that the State's questions and comments concerned the statement that defendant made to the officers, I disagree. On cross-examination, the State did not question defendant about what he did say, but what he did not say. Even assuming that the State was questioning defendant about his statement when asking whether defendant told the officers that Burnside had dropped the items, the State's questioning and closing arguments went beyond that. The State asked defendant if he told his side of the story to Detective Rick Ledbetter, who

investigated the case after defendant was arrested, and defendant said he did not. During closing arguments, the State again commented that defendant did not tell Ledbetter his side of the story. Therefore, I believe that the questioning and comments of the State went beyond merely inquiring about the statement, but instead concerned defendant's postarrest silence.

¶ 31    I would also find that the State's improper use of defendant's postarrest silence does not fall within either of the two exceptions to the rule. Postarrest silence may be introduced for impeachment purposes: "(1) where defendant falsely testifies at trial that he made the same exculpatory statement to the police at the time of his arrest; and (2) where he makes a postarrest, pretrial statement that is manifestly inconsistent with his trial testimony." *Quinonez*, 2011 IL App (1st) 092333, ¶ 34.

¶ 32    Relating to the first exception, the State relies on language used earlier in *Quinonez* that omits the word "falsely", thus allowing impeachment, "when defendant testifies at trial that he made an exculpatory statement to the police at the time of his arrest." *Id.* ¶ 27. Thus, the State says that it can use defendant's postarrest silence under that exception any time a defendant makes *any* exculpatory statement during his or her arrest. However, I believe that the omission of the word "falsely" in paragraph 27 was simply an oversight, considering that *Quinonez* used "falsely" when reciting the rule later in paragraph 34. *Id.* ¶ 34; see *People v. Little*, 223 Ill. App. 3d 264, 274 (1991); *People v. Cox*, 130 Ill. App. 3d 1073, 1079 (1985); *People v. Stack*, 128 Ill. App. 3d 611, 618 (1984); *People v. Adams*, 102 Ill. App. 3d 1129, 1132 (1981); *People v. Foster*, 81 Ill. App. 3d 915, 926 (1980).

¶ 33    Here, the record does not show that defendant falsely testified that he made the same exculpatory statement to the police at the time of his arrest. Defendant never stated that he told the police what had happened. Moreover, the State does not contend, and I do not find, that

defendant made a postarrest, pretrial statement that was manifestly inconsistent with his trial testimony. Therefore, the State's use of defendant's postarrest silence does not fit under either exception.

¶ 34    In sum, the State improperly questioned defendant regarding his postarrest silence. Appellate counsel failed to raise this potentially meritorious issue of which counsel should have been aware. See *People v. Easley*, 192 Ill. 2d 307, 328-29 (2000); *People v. Cathey*, 2012 IL 111746, ¶ 29. Accordingly, I would find that counsel's performance was objectively unreasonable and amounted to deficient performance.

¶ 35    Having determined that appellate counsel's performance was deficient, I would also find that defendant was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687. There is a reasonable probability that, had counsel raised this issue on defendant's direct appeal, the appeal would have been successful. Defendant's trial counsel did not preserve the issue, therefore, appellate counsel would have had to argue the issue under plain error, including arguing whether the evidence was closely balanced. See *Naylor*, 229 Ill. 2d at 605-06. At trial, the only real evidence tying defendant to the crime was Lamb's testimony that he found defendant on the ground after the shooting, wearing a hooded sweatshirt, with gloves, a handkerchief, a police scanner, and proceeds from the crime, along with Burnside's original statement. No one identified defendant as one of the men that entered Carter's residence. Defendant provided another account, and said that he had driven Burnside, stayed in the car, and only emerged once he heard gunshots to see what was going on. Defendant stated that he ran into Burnside, who dropped some items and took off running. Defendant picked these items up and the officers discovered him with them. Burnside testified to this as well. The case amounted to a credibility determination between the two stories and was, thus, closely balanced. See *id.* at 606-07.

¶ 36    Moreover, "the State's references to defendant's postarrest silence *** seriously damaged his credibility and undermined his alibi, which were critical to his defense." *Quinonez*, 2011 IL App (1st) 092333, ¶ 41 (citing *People v. Moody*, 199 Ill. App. 3d 455, 465 (1989); *People v. McMullin*, 138 Ill. App. 3d 872, 873-77 (1985)).

¶ 37    Because I would find both prongs of the *Strickland* test satisfied, I would find that the court erred in denying defendant's postconviction petition. Even though appellate counsel was ineffective, "there is no authority granted in section 122-6 of the Act to order a new appeal." *People v. Ferro*, 195 Ill. App. 3d 282, 287 (1990). Rather, the Act provides, "If the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, bail or discharge as may be necessary and proper." 725 ILCS 5/122-6 (West 2006). I would reverse the circuit court's denial of defendant's postconviction proceedings, and remand for the circuit court to vacate defendant's convictions and conduct further proceedings.